STATE OF NORTH CAROLINA v. ABNER RAY NICHOLSON

No. 564A99

(Filed 1 February 2002)

## 1. Jury— selection—capital trial—request for individual voir dire

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by denying defendant's request for individual voir dire pursuant to N.C.G.S. § 15A-1214(j) during jury selection based on pretrial publicity, because: (1) defendant failed to support his original motion for individual voir dire with any facts or allegations concerning pretrial publicity; (2) a prospective juror's comment during collective voir dire stating that she thought the case was a tragedy did not unduly taint other prospective jurors in the panel; and (3) defendant failed to carry his burden of showing any particular harm resulting from the denial of his motion.

## 2. Jury— selection—capital trial—peremptory challenges— racial discrimination

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by allowing the State to exercise its peremptory challenges against four African-American prospective jurors even though defendant contends the challenges were used in a racially discriminatory manner, because: (1) defendant failed to make a prima facie showing that the State

1

exercised a peremptory challenge on the basis of race regarding two of the jurors when defendant and both of the victims were African-American, several of the State's key witnesses were African-American, the record does not reveal any comments or conduct by the State that would lead to an inference of discrimination, and the two jurors expressed serious reservations about imposing the death penalty; (2) the State offered race-neutral reasons for its challenge of another prospective juror including the juror's equivocal answers regarding the death penalty and the State's lack of confidence that deliberations would be fair to both sides; and (3) the State's acceptance rate of fifty percent of African-American jurors tends to refute a prima facie showing of discrimination.

**3. Jury— selection—capital trial—challenge for cause— death penalty views—rehabilitation**

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by allowing the State's challenge for cause of a prospective juror who stated on voir dire that he was not sure he could fairly consider both life imprisonment without parole and the death penalty, and by denying defendant's request to rehabilitate the juror, because: (1) the juror stated he had strong reservations about the death penalty and that he questioned his ability to impose punishment fairly; (2) the juror left the trial judge with the impression that the juror would be unable to faithfully and impartially follow the law in the guilt-innocence phase of the trial; and (3) defendant has failed to show how further questioning would have illuminated or changed the juror's answers.

**4. Criminal Law— courtroom bailiff also witness for State—motion for mistrial**

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by denying defendant's motion for a mistrial after the trial judge discovered that one of the witnesses for the State was serving as a courtroom bailiff, because: (1) the witness was positioned at the back door of the courtroom for several days, and his duties included opening the doors to the courtroom as needed; (2) the witness had no direct contact or communication with the jury; (3) the trial court relieved the witness of his duties as bailiff for the remainder of the trial once it was alerted to the witness's dual role; (4) mere presence in the courtroom is not sufficient to establish that the bailiff had cus-

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

tody of the jury; and (5) the likelihood that the outcome of the trial would have been different had the witness not served as bailiff is negligible.

**5. Evidence— limitation on ability to show self-defense—gratuitous self-defense instruction**

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by excluding the testimony of two psychiatrists tending to show defendant's perception of the need to use deadly force to defend himself because: (1) there was no evidence to support a finding that defendant formed a belief that it was necessary to kill either his wife or the chief of police to protect defendant from death or serious harm; (2) defendant is not entitled to argue self-defense while still insisting that he did not fire a gun at anyone and that he did not intend to shoot anyone; (3) expert testimony was irrelevant since defendant's own testimony showed that he did not believe it was necessary to use deadly force against any individuals to protect himself; and (4) the self-defense instruction defendant received in this case was a benefit to which he was not entitled, and defendant was not allowed to present additional evidence in support of a defense not warranted by the evidence.

**6. Evidence— prior crime or bad acts of victim—embezzlement from employer—motion in limine**

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by allegedly granting the State's motion in limine prohibiting defendant from introducing evidence concerning embezzlement by one of the victims from her employer, because: (1) there is nothing in the record to show that the trial court ever granted the State's motion in limine when the trial court merely postponed ruling until defendant indicated he was interested in entering into that line of inquiry; and (2) defendant never indicated he wanted to ask these questions, and he told the trial court he was not attempting to inquire about the alleged embezzlement.

**7. Evidence— hearsay—excited utterance—state of mind exception**

The trial court did not abuse its discretion in a double capital first-degree murder prosecution by allowing statements of the victim wife through the victim's mother that the victim told her stepfather that defendant had a gun and said he was going to kill

her, and that the victim told her mother that defendant said on the day of the killing that he did not want anyone else at the house when he came to pick up his clothes but the victim was going to have the police serve defendant with a warrant when he came to her house, because: (1) the first statement falls under the N.C.G.S. § 8C-1, Rule 803(2) excited utterance exception since it was made under stress caused by defendant who at that time was allegedly threatening the victim in the back of the witness's car, and the statement was made spontaneously without time for reflection; and (2) the statements concerning defendant coming to the house falls under the N.C.G.S. § 8C-1, Rule 803(3) state of mind exception to show the sequence of events on the day of the killings and to illustrate the victim's then-existing intent to protect herself by calling the police and having defendant served with the warrant.

**8. Homicide— first-degree murder—premeditation and deliberation—sufficiency of evidence**

The trial court did not abuse its discretion by denying defendant's motion to dismiss the two first-degree murder charges even though defendant contends there was insufficient evidence of premeditation and deliberation, because the State presented evidence that: (1) defendant and his wife victim had been having marital difficulties near the time of the killings; (2) the wife told her parents that defendant had choked her on one occasion and had threatened to kill her on another; (3) defendant retrieved his pistol from the pawn shop one day prior to the killings; (4) eyewitnesses saw defendant punch the victim in the mouth on the day of the killing; (5) defendant requested that the victim be alone at her house after the victim asked him to come get his clothes, and defendant brought his gun; (6) defendant shot the chief of police victim in the face as the chief tried to serve defendant with a warrant, and the chief's sidearm was still in its holster when he was shot; (7) the wife ran from defendant as he chased her with his gun and defendant shot her after she tripped and fell onto the floor; and (8) defendant fired at least five shots that day, most of them at close range, and he fled the scene after the killings, disposing of the gun along the way.

**9. Sentencing— capital—victim impact statements**

The trial court did not abuse its discretion in a double capital first-degree murder sentencing proceeding by allowing the State to present a victim impact statement under N.C.G.S.

§ 15A-833(a)(1), because: (1) the statements of the victim wife's mother concerning the impact of her daughter's death on her family properly related the extent of the psychological and emotional injury caused by defendant without being unduly prejudicial; (2) there was no evidence in the record showing the jury was swayed to base its decision solely on the mother's statements; and (3) none of the aggravating circumstances submitted to the jury derived from the victim impact evidence, and the State did not ask the jury to base its decision on this evidence.

**10. Sentencing— capital—defendant's death—family impact evidence**

The trial court did not abuse its discretion in a double capital first-degree murder sentencing proceeding by denying defendant's request to present family impact evidence, because: (1) the voir dire testimony of defendant's sister-in-law as to the stress and sickness in her family since the time of the killing did not go to any aspect of defendant's character, record, or circumstance of the offense; and (2) the statements did not reduce defendant's moral culpability.

**11. Sentencing— capital—prosecutor's argument—defendant's possible future conduct—defendant's courtroom demeanor**

The trial court did not err in a double capital first-degree murder sentencing proceeding by failing to intervene ex mero motu during the State's closing arguments referencing defendant's possible future conduct and defendant's courtroom demeanor, because: (1) the State's comment on the possibility of defendant's future dangerousness to prison staff and inmates was appropriate; (2) the State engaged in permissible argument when it asked the jury to recommend death specifically to deter defendant from committing another murder; and (3) the State acted within the bounds of propriety when it characterized defendant as seeming bored with the courtroom proceedings, and the State's remarks pertaining to defendant's courtroom conduct were permissible since his demeanor was before the jury at all times.

**12. Sentencing— capital—prosecutor's argument—jury as voice of community—victim impact statements**

The trial court did not err in a double capital first-degree murder sentencing proceeding by failing to intervene ex mero motu during the State's closing arguments referencing the jury as

the voice of the community and using victim impact statements, because our Supreme Court has upheld arguments that remind the jury that its verdict will send a message to the community or function as the conscience of the community as long as the State does not encourage the jury to consider public sentiment in its deliberations.

**13. Sentencing— capital—prosecutor's argument—remuneration of defendant's expert witnesses**

The trial court did not err in a double capital first-degree murder sentencing proceeding by allowing the State's closing arguments concerning remuneration of defendant's expert witnesses including the statement that the experts would not get paid unless they said what defendant wanted to hear, because: (1) the argument simply illustrated discrepancies between the diagnoses made by two of defendant's expert witnesses; and (2) the experts' conflicting testimony prompted the State to question their credibility and impartiality.

**14. Sentencing— capital—aggravating circumstances—murder committed to avoid lawful arrest**

The trial court did not err in a double capital first-degree murder sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that the murder of the chief of police victim was committed for the purpose of avoiding or preventing lawful arrest, because: (1) the evidence tends to show that defendant knew the police were looking for him as a result of his assault on his wife; (2) the facts that defendant departed when police responded after the assault, defendant demanded that no police be at the victim wife's trailer when he arrived, and defendant's repeated phone calls to question whether there was anyone else at the trailer before he arrived all tended to show that defendant was attempting to avoid arrest; and (3) when the chief of police victim informed defendant that the chief had a warrant for defendant's arrest, defendant shot him.

**15. Sentencing— capital—aggravating circumstances—capital felony committed against law enforcement officer engaged in official duties**

The trial court did not err in a double capital first-degree murder sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(8) aggravating circumstance that the capital felony

was committed against a law enforcement officer while engaged in the performance of his official duties in the case involving the chief of police victim, because: (1) the evidence established that the chief of police was engaged in his official duties as a law enforcement officer at the time of the killing when he arrived at the victim wife's trailer in uniform with a warrant for defendant's arrest; and (2) defendant himself testified that the chief told defendant that he was serving a warrant for defendant's arrest.

**16. Sentencing— capital—aggravating circumstances—murder committed to avoid lawful arrest—capital felony committed against law enforcement officer engaged in official duties**

The trial court did not err in a double capital first-degree murder sentencing proceeding by submitting both the N.C.G.S. § 15A-2000(e)(4) aggravating circumstance that the murder of the chief of police victim was committed for the purpose of avoiding or preventing lawful arrest and the N.C.G.S. § 15A-2000(e)(8) aggravating circumstance that the capital felony was committed against a law enforcement officer while engaged in the performance of his official duties in the case involving the chief of police victim even though defendant contends the two aggravating circumstances allegedly rely on the same evidence, because: (1) submission of both the (e)(4) and (e)(8) aggravating circumstances in a single case address different aspects of the crime; (2) the (e)(4) circumstance was submitted in this case to show that one of defendant's motivations in shooting the chief of police victim was to avoid arrest for the previous assault of defendant's wife, which addressed defendant's subjective motivation for the killing; and (3) the (e)(8) circumstance was submitted in this case to show that the chief of police was performing an official duty when he responded to the call from defendant's wife, which addressed the factual basis of defendant's crime.

**17. Sentencing— capital—aggravating circumstances—murder part of a course of conduct**

The trial court did not err in a double capital first-degree murder sentencing proceeding by submitting the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance that the murder was part of a course of conduct including the commission by defendant of other crimes of violence, because: (1) evidence that a defendant killed more than one victim is sufficient to support this

aggravating circumstance, and the evidence in this case reveals that the two killings were committed within moments of each other, within feet of each other, and with the same weapon; and (2) a different result would not have been probable even if the trial court had explicitly specified the evidence which the jurors were to consider.

**18. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity**

The trial court did not err in a double capital first-degree murder sentencing proceeding by its instruction on the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance that defendant has no significant history of prior criminal activity when the trial court added the additional phrase "before the date of the murder," because: (1) the additional language was a correct statement of the law since the (f)(1) circumstance applies only to criminal activity occurring before the murder for which a defendant is being tried; (2) the instruction revealed that the jurors were not permitted to refuse to give this circumstance mitigating value if they found it to exist; and (3) the trial court did not convert the statutory mitigating circumstance into a nonstatutory mitigating one simply by adding clarifying language.

**19. Sentencing— capital—mitigating circumstances—defendant acted under duress or domination of another person**

The trial court did not err in a double capital first-degree murder sentencing proceeding by failing to submit the N.C.G.S. § 15A-2000(f)(5) mitigating circumstance that defendant acted under duress or the domination of another person, because although the evidence viewed in the light most favorable to defendant tends to show that the victim wife induced defendant to come to the trailer so that defendant could be arrested and that defendant may be susceptible to pressure from her generally, there is no evidence showing that the wife's actions pressured defendant into using deadly force against her or the chief of police victim through duress or dominance.

**20. Sentencing— capital—nonstatutory mitigating circumstances—limitations on defendant's intellectual functioning**

The trial court did not err in a double capital first-degree murder sentencing proceeding by failing to submit defendant's requested nonstatutory mitigating circumstance that defendant

had limitations on his intellectual functioning, because the miti-
gating circumstance was subsumed in the circumstances already
submitted to the jury.

21. **Sentencing— capital—mitigating circumstances—peremp-
tory instruction**

The trial court did not err in a double capital first-degree
murder sentencing proceeding by failing to give a peremptory
instruction on four statutory mitigating circumstances includ-
ing the N.C.G.S. § 15A-2000(f)(1) mitigator of no significant
prior criminal history, the N.C.G.S. § 15A-2000(f)(2) mitigator
that the capital felony was committed while defendant was un-
der the influence of mental or emotional disturbance, the
N.C.G.S. § 15A-2000(f)(6) mitigator that the impaired capacity of
defendant made him unable to appreciate the criminality of his
conduct or to conform his conduct to the requirements of law,
and the N.C.G.S. § 15A-2000(f)(7) mitigator concerning the age
of defendant at the time of the crime, because: (1) the State
presented evidence that defendant had an earlier conviction for
assault on a female, that defendant choked his wife, defendant
hit his wife in the mouth, and defendant threatened to kill his
wife on various occasions; (2) an expert testified that while she
found defendant had borderline intellectual functioning, she did
not believe he suffered from a psychotic disorder and cross-
examination of another expert revealed weaknesses in his diag-
nosis of defendant as having psychological problems; and (3)
defendant's mental age was by no means established by a con-
sensus of experts.

22. **Sentencing— capital—nonstatutory mitigating circum-
stances—peremptory instruction**

The trial court did not err in a double capital first-degree
murder sentencing proceeding by failing to give a peremptory
instruction for each nonstatutory mitigating circumstance,
because: (1) defendant did not submit his request for a particular
instruction on the nonstatutory mitigating circumstances in writ-
ing, but merely asked the trial court to give something similar to
pattern jury instruction 150.11; (2) defendant failed to specifi-
cally address each mitigating circumstance when he requested a
peremptory instruction for the nonstatutory mitigating circum-
stances; and (3) defendant has made no argument that the evi-
dence supporting the nonstatutory mitigating circumstances was
uncontroverted or credible.

**23. Sentencing— capital—mitigating circumstances—jury instruction**

The trial court did not commit plain error in a double capital first-degree murder sentencing proceeding by failing to fully and completely instruct the jury regarding the mitigating circumstances submitted in the case involving the chief of police victim, because: (1) the trial court is not required to repeat a definition each time a word or term is repeated in the charge when it has once been defined; (2) no expression of opinion arises merely from the comparative amount of time devoted to giving an instruction; (3) defendant has failed to carry his burden of showing that he was prejudiced by the trial court's decision not to repeat the explanations of each mitigating circumstance when the jury was fully and carefully instructed regarding its consideration of mitigating circumstances; (4) the trial court expressly instructed the jury that it should consider each mitigating circumstance in reference to the death of the chief of police and that it should consider the law as the trial court had previously explained it as to those circumstances; and (5) the trial court merely avoided unnecessary repetition of information already given.

**24. Sentencing— capital—oral instructions—consideration of nonstatutory mitigating circumstances in relation to statutory catchall**

The trial court did not commit plain error in a double capital first-degree murder sentencing proceeding by its oral instructions to the jury for consideration of nonstatutory mitigating circumstances in relation to the statutory catchall circumstance, because: (1) defendant has produced no evidence to show that the jury's treatment of the catchall mitigator resulted from jury confusion; and (2) viewed in their entirety and within the context they were given, the trial court's instructions as to the catchall mitigator presented the law fairly and clearly.

**25. Sentencing— capital—mitigating circumstances—wording of catchall mitigator on punishment form**

The trial court did not commit plain error in a double capital first-degree murder sentencing proceeding by its wording of the catchall mitigating circumstance under N.C.G.S. § 15A-2000(f)(9) on the punishment forms which omitted the final phrase "one or more of us finds this circumstance to exist," because: (1) the fail-

ure of any juror to find such a circumstance based on his own personal review of the evidence does not necessarily mean the jurors misunderstood or misapplied the instruction; and (2) there was no reasonable probability that the omission of the phrase had any impact on the jurors' failure to find the catchall circumstance or on the verdict given the trial court's oral instructions and the language on the forms.

**26. Constitutional Law— right to present own theory of case— impeachment of defendant as witness—proof of an unrelated crime—instruction on limited purpose**

The trial court did not violate defendant's Sixth Amendment constitutional right to develop and present his own theory of the case free from outside interference in a double capital first-degree murder trial by granting the State's motion to submit North Carolina pattern jury instruction 105.40 concerning impeachment of defendant as a witness by proof of an unrelated crime, because: (1) the record contains no evidence that this instruction interfered with defendant's right to develop and present his own theory of the case; and (2) the prosecution was free to argue defendant's conviction to the jury for purposes of impeaching his testimony since it had properly elicited evidence of the conviction on previous cross-examination and therefore the prior conviction was already subject to the jury's consideration.

**27. Homicide— first-degree murder—self-defense—pattern jury instruction**

The trial court did not err in a double capital first-degree murder trial by denying defendant's request to substitute language in North Carolina pattern jury instruction 206.10 on self-defense to use the phrase "to kill the victim" instead of "to use deadly force against the victim," because: (1) defendant's evidence did not support a self-defense instruction at all; and (2) defendant presented no evidence to show that his use of deadly force was intended only to disable, and not to kill, his two victims.

**28. Sentencing— death penalty—not disproportionate**

The trial court did not err in a double capital first-degree murder trial by sentencing defendant to the death penalty, because: (1) defendant was convicted of two counts of first-degree murder on the basis of malice, premeditation, and delib-

eration; (2) defendant deliberately murdered a law enforcement officer for the purpose of evading lawful arrest; (3) the Supreme Court has never found a death sentence disproportionate in a case where the jury has found a defendant guilty of murdering more than one victim; (4) the jury found the course of conduct aggravating circumstance under N.C.G.S. § 15A-2000(e)(11), which standing alone is sufficient to support a sentence of death; and (5) defendant murdered his wife in their home.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Ragan, J., on 18 November 1999 in Superior Court, Wilson County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 14 May 2001.

*Roy Cooper, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Thomas R. Sallenger for defendant-appellant.*

MARTIN, Justice.

On 11 September 1997 Abner Ray Nicholson (defendant) was indicted for the first-degree murders of his wife, Gloria Brown Nicholson (Mrs. Nicholson), and the Sharpsburg Police Department Chief of Police, Willard Wayne Hathaway (Chief Hathaway). Defendant was also indicted for the attempted first-degree murder of Mrs. Nicholson's stepfather, Marvin Roscoe Badger (Badger). Defendant was tried capitally at the 25 October 1999 Criminal Session of Superior Court, Wilson County. The jury found defendant guilty of each count of first-degree murder and not guilty of attempted first-degree murder. Following a capital sentencing proceeding, the jury recommended a sentence of death for each first-degree murder conviction, and the trial court entered judgment in accordance with those recommendations.

The state presented evidence at defendant's trial which is summarized as follows. Defendant and Mrs. Nicholson lived in a trailer on Weaver Circle in Sharpsburg, North Carolina, along with Mrs. Nicholson's two daughters, ages three and eight. One of the Nicholsons' neighbors, Emily McKenzie (McKenzie), first became aware the Nicholsons were having marital problems on 15 July 1997. On that day, Mrs. Nicholson went to McKenzie's house with her children and asked to use McKenzie's telephone. Mrs. Nicholson looked

upset and explained that she and defendant had argued, and that she and the children were going to her mother's house. McKenzie talked to the children and noticed they seemed very distant, as if they had been through a difficult experience.

On 16 July 1997, defendant visited the Hardly Able Pawn and Gun Shop in Sharpsburg. There, he retrieved a Bauer .25-caliber automatic pistol with a pearl handle that he had pawned in early June of that year. Later that day, defendant and Mrs. Nicholson went to the Badgers' house to speak to Mrs. Nicholson's mother and stepfather about the state of their relationship. Mrs. Nicholson told her parents she did not want to be married anymore. Defendant said that he wanted to work things out but that his wife did not. Mrs. Nicholson asked her husband to tell her parents what he had done. When defendant said he had not done anything, Mrs. Nicholson got up and demonstrated how he had attempted to choke her in April of that year. Mrs. Badger told defendant she did not want her daughter to be with him any more.

On the evening of 16 July 1997, the Nicholsons and the Badgers took Mrs. Nicholson's youngest daughter to the emergency room because she had a fever. The Nicholsons rode together in the backseat of Mr. Badger's van. During the trip to the hospital, defendant could be heard whispering to Mrs. Nicholson. At one point, Mrs. Nicholson said, "No. No. No. I ain't gonna (sic) do it. I don't want that." After more whispering, Mrs. Nicholson told her stepfather that defendant had threatened to kill her and had told her he was carrying a gun. Defendant then said, "No, I didn't. I was lying. I ain't got no gun." When they arrived at the hospital, defendant did not go inside with the rest of the family and could not be located when they were ready to go home.

After leaving the hospital, Mrs. Nicholson and the Badgers drove to the Nicholsons' trailer so Mrs. Nicholson could get some clothes. Mr. Badger walked inside with her to use the bathroom. They found defendant inside, lying on the couch. Mr. Badger then went into the bathroom. Mrs. Badger, who was sitting in the van, heard Mrs. Nicholson call her from the front doorway. As Mrs. Badger walked towards the trailer, defendant came out and punched Mrs. Nicholson in the face with his fist. Her nose started to bleed. Mr. Badger heard his stepdaughter "holler," and when he came out of the bathroom, she told him defendant had hit her. Defendant claimed Mrs. Nicholson had been hit by the door.

Mrs. Nicholson called the police, and defendant began walking down the road away from the trailer. Deputy Moss (Moss) of the Sharpsburg Police Department responded to the trailer after receiving a dispatch for a "domestic in progress," "Signal One, armed and dangerous." When Moss arrived, defendant ran into a nearby cornfield, and Moss called for backup. It was now shortly after midnight. Mrs. Nicholson was very upset and told Moss that defendant had punched her, causing the bleeding, and had threatened to kill her if she ever left him. She also said that defendant was armed and that he had pawned his weapon but must have retrieved it. Moss advised her to take her mother and stepfather with her as witnesses to the magistrate's office and swear out a warrant for defendant's arrest, which she did. Before they left, Mr. Badger blocked the back door of the trailer with a couch from the living room so defendant could not get in by that route. Moss stayed at the trailer until about 4:30 a.m. to see if defendant would return to get his car, but he did not. Mrs. Nicholson spent the night at her parents' house.

On the morning of 17 July 1997, Moss informed Chief Hathaway of the incident and told him that a warrant had been sworn out for defendant's arrest. Mrs. Nicholson returned to her trailer around 10:30 a.m. to get some clothes. Her stepfather and her fifteen-year-old brother, Jarrin Brown (Brown), went with her. Her stepfather was unarmed. While there, Mrs. Nicholson called defendant's sister in an attempt to get in touch with defendant. Defendant called her back shortly thereafter, and Mrs. Nicholson asked him to come over and get his clothes. Defendant agreed but said he did not want anyone else to be at the trailer when he arrived.

Mrs. Nicholson then called the police and asked if an officer could leave his car at the station and walk to her trailer. The Assistant Town Clerk answered and told Mrs. Nicholson that her request was against department policy. Chief Hathaway, the only officer on duty, called Mrs. Nicholson back and talked with her further. He explained that he could not leave his car but that he could come over and serve the warrant on defendant. He told Mrs. Nicholson to call him back before she let defendant into the trailer, and he would come over then. Defendant called Mrs. Nicholson a few minutes later and asked if anyone else was at the trailer. Mrs. Nicholson told him "no." She then told her stepfather and brother to wait in the back bedroom until the police arrived.

Defendant arrived at the trailer shortly thereafter and knocked on the door. Mrs. Nicholson stalled by saying she was getting dressed,

and called the police. She then let defendant inside the trailer. Mrs. Nicholson was in the kitchen when defendant entered the trailer, and Mr. Badger and Brown heard her telling defendant she wanted him to get his clothes and leave. When defendant said he did not have anything to put his clothes in, Mrs. Nicholson told him to get a trash bag.

At that point, Chief Hathaway arrived at the trailer in uniform with a piece of paper in his hand. Mrs. Nicholson let him in when he knocked. She then told Mr. Badger and Brown they could come out from the back bedroom. As they walked down the hallway, Chief Hathaway approached defendant. Defendant turned, pushed Chief Hathaway away, dropped the trash bag, and shot the Chief in the face. The Chief fell against defendant, and defendant shoved him back. Chief Hathaway's gun was in his holster when he was shot.

Mr. Badger attempted to open the rear sliding storm door, but before he could open it, defendant chased Mrs. Nicholson past him. As Mr. Badger opened the door and got outside, he heard more shooting. At the same time, Brown turned and started towards the back bedroom. As he did so, he saw his sister lying on the floor near the front door. He watched defendant walk over to her, lean down, and shoot her. Brown ran to the back bedroom and waited there until he heard defendant leave the trailer. He then ran out of the trailer and saw defendant walking towards the cornfield.

Brown went back inside the trailer, saw that his sister was not moving, and saw that Chief Hathaway was still breathing. He grabbed the Chief's radio and attempted to call for help. Brown took the Chief's gun out of its holster in case defendant returned, and he called 911. When police arrived, Brown put Chief Hathaway's gun on a recliner and went outside to meet them. Police later found the Chief's gun, with the safety still on. There was no evidence it had been fired.

Defendant was apprehended around 11:45 p.m. that same day. Defendant told a state trooper who assisted in his apprehension that he had dropped the gun in the woods. The gun that defendant had retrieved from the pawnshop was found the next day in a nearby cornfield. It was later determined that all of the bullets collected for evidentiary purposes in this case had been fired from that gun.

Dr. Thomas Clark, a forensic pathologist in the Office of the Chief Medical Examiner, performed an autopsy on the body of Chief

Hathaway. The autopsy revealed that Chief Hathaway died from a gunshot wound to the head. Dr. Clark concluded that the bullet had entered Chief Hathaway's head below the right eye, passed through his brain, and lodged on the surface of his brain. The bullet was removed during the autopsy. The wound appeared to have been made from a distance of two feet or greater and would have quickly resulted in unconsciousness and death.

Dr. Page Hudson, professor of pathology at East Carolina University, performed an autopsy on the body of Mrs. Nicholson. Dr. Hudson determined the cause of Mrs. Nicholson's death to be gunshot wounds to the head. Mrs. Nicholson had two gunshot wounds to the right side of her scalp, one below the fourth finger on her left hand, and one on the wrist of her right hand. Dr. Hudson opined that the wounds were caused by only two or three bullets and that they passed through Mrs. Nicholson's wrist and hand before striking her head. Dr. Hudson recovered two bullets from Mrs. Nicholson's skull.

Defendant presented evidence at trial as follows. He and Mrs. Nicholson met at Tim's Auto Sales, where they worked together, and were married in January 1997. Defendant stated he suffered from high blood pressure, took medication for it, and had been hospitalized on 4 July 1997 as a result of it. Defendant also said that on 15 July 1997, his wife had taken him to see a "mental health doctor." He stated that during their marriage, Mrs. Nicholson often hit him, but that he never hit her back. He said she carried a gun in her pocketbook and had threatened him with it before. He also said that she had cut him with a knife several times. Defendant further testified that Mr. Badger had previously threatened him with a gun. Defendant testified that on 16 July 1997, his wife tried to cut him with a knife and called him names while they were driving to her parents' house. When they got to the Badgers' house, she continued to try to cut him. Mrs. Nicholson cut his neck and hand, chased him with the knife, and stopped only when her youngest brother ran to tell Mrs. Badger what was happening.

Defendant remembered that one of Mrs. Nicholson's children had gotten sick on 16 July 1997. He explained that when the family arrived at the hospital, he called his ex-girlfriend, Delores Sledge (Sledge), to come pick him up. Sledge took him to his trailer in order for him to get his clothes and car so he could leave. Defendant was still at the trailer when the family returned from the hospital. He told

his wife that he had gone home because he had not taken his medication and was tired and hungry. Defendant testified his wife told her stepfather to take the tags off of defendant's car, told defendant he was not going anywhere, and said he could not get his clothes. As he attempted to leave, defendant said he pushed the screen door out of his wife's hand, and she grabbed the back of his shirt and started hitting him. Defendant told her to stop, and she did, but the screen door sprang back and hit Mrs. Nicholson in the nose, causing it to bleed.

Defendant testified he then walked off, intending to go to his sister's house and wait to get his clothes until the next day. Defendant said he called a woman named Delores Leach (Leach), who picked him up and let him spend the night at her house. The next morning, Leach drove defendant to his sister's house. Mrs. Nicholson called him there, threatened that she had her gun, and said that he needed to come get his things immediately. He borrowed his sister's car and drove to the trailer. When he knocked on the door, his wife told him to wait until she got dressed. She shortly opened the door, then went to the kitchen to get a trash bag for defendant to put his clothes in. As she walked back towards him, she told defendant not to make her shoot him.

Next, defendant remembered a police officer walked into the trailer. Mrs. Nicholson said, "Shoot him, shoot him, if you don't I am." Defendant turned around in a panic and saw the officer walking towards him with his hand on his gun. The officer said he had a warrant for defendant's arrest, hit defendant in the face, and spit in defendant's face. Defendant said at that point he "went blank" and could not see. He heard his wife screaming, the sound of stumbling, and the sound of firing. He then saw his wife falling and thought she was reaching for her pocketbook. It appeared to him that Mr. Badger had a gun. Afraid, he fired two shots into the floor of the trailer as he ran outside. Defendant stated that he was not aiming at anyone and did not hit anyone when he fired. He further testified that Mr. Badger had shot Chief Hathaway in the face when he ran out from the back bedroom, and he assumed it was also Mr. Badger who had shot Mrs. Nicholson.

Two men who had worked with defendant at Tim's Auto Sales testified. Both said defendant was not a violent person and that they had seen Mrs. Nicholson hit defendant and call him names, but they had never seen defendant hit her back. David Lawton said that on 16 July 1997, the week after defendant had quit his job, defendant came to

Tim's Auto Sales to ask for his job back. He said defendant was shaking, had lost weight, and did not seem like himself. Dennis Harper (Harper) testified that defendant was easygoing and in love with his wife. He said that when defendant came into the office on 16 July, he seemed to be under a lot of stress. Defendant asked Harper to call Mrs. Nicholson, saying she was acting strangely, but Harper did not do so.

Another co-worker at Tim's Auto Sales, Stephanie Speight (Speight), said Mrs. Nicholson told her that Mr. Badger had threatened defendant with a gun and that Mrs. Nicholson kept a gun in her pocketbook. Speight testified that Mrs. Nicholson was frequently abusive towards defendant at work and that, at times, she had held Mrs. Nicholson's hands to prevent her from hitting defendant. Speight said she and a sales manager had met with Mrs. Nicholson to warn her that she could be charged with spousal abuse.

Sledge testified that defendant was the father of her daughter. She said that defendant had never hit her but that one time he grabbed her clothes as she was walking away and they began to rip. She said that when she picked defendant up the night before the shootings he had a tissue on his neck and told her that his wife had cut him with a knife. She testified defendant seemed nervous and depressed.

Stephanie Lynch, a neighbor of the Nicholsons, testified that she saw Mrs. Nicholson and Chief Hathaway together almost every day at a local store.

Additional facts are provided as necessary below.

## JURY SELECTION

[1] We first address the trial court's denial of defendant's request for individual *voir dire*. Defendant claims that the trial court's summary denial of his request violated his state and federal constitutional rights.

Upon a showing of good cause, the trial court may require jurors to be selected individually in capital cases. N.C.G.S. § 15A-1214(j) (1999). Individual *voir dire* may be appropriate where highly sensitive issues such as pretrial publicity are involved. *See, e.g., State v. Jaynes*, 353 N.C. 534, 544, 549 S.E.2d 179, 189 (2001). The burden rests on the defendant to show the particular harm resulting from the denial of his request for individual *voir dire. State v. Barnes*, 345 N.C.

184, 208, 481 S.E.2d 44, 56-57, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Individual *voir dire* may not necessarily be appropriate, despite pretrial publicity, where none of the jurors indicates that he or she would have difficulty setting aside any pretrial impressions. *State v. Atkins*, 349 N.C. 62, 106, 505 S.E.2d 97, 124 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). Absent an abuse of discretion, we will not disturb the trial court's ruling on a motion requesting individual *voir dire. State v. Hyde*, 352 N.C. 37, 46, 530 S.E.2d 281, 288 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001).

Prior to jury selection, defendant requested individual *voir dire* by written motion, and then presented the motion orally to the trial court. The trial court initially denied the motion. Later, on collective *voir dire*, prospective juror Jones stated she had "[r]ead about [the facts] in the newspaper when it occurred, and . . . thought about what a tragedy it was." Jones also stated that she did not form any opinions as to the guilt or innocence of defendant at that time. Defendant then requested individual *voir dire* as to prospective juror Jones, and the trial court allowed defendant an opportunity to state his reasons therefor. The trial court denied defendant's request, and the *voir dire* of Jones continued as follows:

Q. The newspaper that you read that had some information that had something about this case, was this a local newspaper here?

A. Juror Number One: Yes, the *Sun Journal*. That's the best of my remembrance.

Q. Without getting into the specific facts about the case, we're not asking about that, the newspaper article that you read about it, did it mention any of the facts and circumstances of the case?

A. Juror Number One: Just what happened, to the best of my recollection. Just what was supposed to have happened, as news articles go.

Q. And . . . at that time, did you form an opinion as to whether or not the person that was charged was guilty or innocent in this case?

A. Juror Number One: No, sir.

Q. Did you form an opinion as to what punishment ought to be if a person was found guilty of what you read about?

A.  Juror Number One: No, sir.

Q.  Did you discuss what you read in the newspaper with anyone?

A.  Juror Number One: I may have mentioned it to my husband, since we are most of the time reading the papers at the same time. Other than that, no.

Q.  Did he express any opinion to you about those issues?

A.  Juror Number One: No, sir.

Q.  Did you express any opinion to him about those issues?

A.  Juror Number One: No, sir, except: "What a tragedy."

Defendant argues the statement "What a tragedy" prejudiced him before the entire jury panel and tainted the venire. He contends that because this was a highly publicized case from a small community, individual *voir dire* should have been permitted to allow counsel to discuss the problem of pretrial publicity.

Defendant failed to support his original motion for individual *voir dire* with any facts or allegations concerning pretrial publicity. When he later presented the motion orally to the trial court, defendant simply referred to the prior written motion, adding no supporting facts. The trial court allowed defendant a full opportunity to state his reasons when he requested individual *voir dire* of Jones. He later challenged prospective juror Jones and succeeded in having her removed from the jury panel. Jones stated that she did not form any opinions as to the guilt or innocence of defendant and did not indicate that she would have difficulty setting aside any pretrial impressions if selected. *See Atkins*, 349 N.C. at 106, 505 S.E.2d at 124. These statements were not specific enough to adversely influence the decisions of the other jurors selected. *See Hyde*, 352 N.C. at 49-50, 530 S.E.2d at 290-91 (prospective juror's comment that he would give one of defendant's potential witnesses less credibility since he knew the witness, and another prospective juror's comment that one of defendant's attorneys had "misrepresented" her former son-in-law in a child abuse case did not unduly taint other prospective jurors in the panel). Defendant has failed to carry his burden of showing any particular harm resulting from the denial of his motion for individual *voir dire*. *See Barnes*, 345 N.C. at 208, 481 S.E.2d at 56-57. This argument fails.

[2] Defendant next alleges that his state and federal constitutional rights were violated when the trial court allowed the state to exercise

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

its peremptory challenges in a racially discriminatory manner. Defendant specifically disputes the state's challenges of prospective jurors Greene, Foye, McCoy, and Smith.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges for racially discriminatory reasons. *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986). Article I, Section 26 of the North Carolina Constitution likewise bars race-based peremptory challenges. *State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999).

In *Batson*, the United States Supreme Court established a three-part test to determine whether the state impermissibly discriminated on the basis of race when selecting jurors. 476 U.S. at 96-98, 90 L. Ed. 2d. at 87-89. Our courts have adopted the *Batson* test for reviewing the validity of peremptory challenges under the North Carolina Constitution. *State v. Lawrence*, 352 N.C. 1, 13-14, 530 S.E.2d 807, 815-16 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001); *State v. Mitchell*, 321 N.C. 650, 653-54, 365 S.E.2d 554, 556 (1988). The defendant must first make a *prima facie* showing that the state exercised a peremptory challenge on the basis of race. *Lawrence*, 352 N.C. at 14, 530 S.E.2d at 815. If this showing is made, the trial court advances to the second step, where the burden shifts to the state to offer a facially valid, race-neutral rationale for its peremptory challenge. *Id.* The state's explanation must be "clear and reasonably specific." *Id.* The state's proffered rationale need not be persuasive or even plausible, so long as it appears facially valid and betrays no inherent discriminatory intent. *Id.* at 14, 530 S.E.2d at 816. In the final step under *Batson*, the trial court must decide whether the defendant has shown purposeful discrimination. *Id.* To do this, the trial court considers various factors such as " 'susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors.' " *State v. Golphin*, 352 N.C. 364, 427, 533 S.E.2d 168, 211 (2000) (quoting *State v. White*, 349 N.C. 535, 548-49, 508 S.E.2d 253, 262 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999)), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 305 (2001).

The trial court's determination is given deference on review because it is based primarily on firsthand credibility evaluations.

*Id.* The reviewing court will uphold the trial court as long as its decision is not clearly erroneous. *Lawrence,* 352 N.C. at 14, 530 S.E.2d at 816.

Defendant first argues that the trial court erred by allowing, over defendant's objection, the state's peremptory challenges of prospective jurors McCoy and Smith. It is clear from the record that the trial court's denial of defendant's objection amounted to a finding that defendant had failed to make a *prima facie* showing under the first prong of *Batson. See State v. Locklear,* 349 N.C. 118, 138, 505 S.E.2d 277, 289 (1998), *cert. denied,* 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). When the trial court determines that the defendant has failed to make a *prima facie* showing, our review is limited to determining whether the trial court's ruling on this point was in error. *State v. Smith,* 351 N.C. 251, 262,. 524 S.E.2d 28, 37, *cert. denied,* 531 U.S. 862, 148 L. Ed. 2d 100 (2000); *Locklear,* 349 N.C. at 137, 505 S.E.2d at 288.

The factors to review in determining whether a defendant has made a *prima facie* showing include: whether the "prosecutor used a disproportionate number of peremptory challenges to strike African-American jurors in a single case," *Smith,* 351 N.C. at 262, 524 S.E.2d at 37; whether the defendant is a "member of a cognizable racial minority," *State v. Porter,* 326 N.C. 489, 497, 391 S.E.2d 144, 150 (1990); and whether the state's challenges appear to have been motivated by racial discrimination, *id.* Other factors a court may examine include "the victim's race, . . . the race of the State's key witnesses," and "whether the prosecutor made racially motivated statements or asked racially motivated questions of black prospective jurors . . . that raise[d] an inference of discrimination." *State v. Gregory,* 340 N.C. 365, 397-98, 459 S.E.2d 638, 656 (1995), *cert. denied,* 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

Defendant and both of the victims in this case were African-American. Several of the state's key witnesses were also African-American. The record does not reveal any comments or conduct by the state that would lead to an inference of discrimination. *See id.* While the state did exercise its first two peremptory challenges to excuse African-American jurors, those excusals took place too early in *voir dire* to establish a pattern of discrimination. *See Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88; *Gregory,* 340 N.C. at 397-98, 459 S.E.2d at 656. Defendant alleges racial discrimination based on the fact that the only two prospective jurors in the first panel to be peremptorily

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

challenged, McCoy and Smith, were African-American. While this is true, the record also reveals that, of a panel of twelve prospective jurors, prospective jurors McCoy and Smith were the only two to express serious reservations about imposing the death penalty. *See Porter*, 326 N.C. at 498, 391 S.E.2d at 151 (noting that in evaluating a *prima facie* case under *Batson*, the trial court must gauge whether similarly situated white veniremen escaped the state's challenges). The responses of these prospective jurors, even if insufficient to support a challenge for cause, see *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, are relevant to a determination of whether defendant has made a *prima facie* showing, *see State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 387 (1996), *cert. denied*, 519 U.S. 1061, 136 L. Ed. 2d 618 (1997). As defendant has failed to make a *prima facie* showing of racial discrimination under *Batson*, the trial court's ruling was not in error. *See Smith*, 351 N.C. at 262, 524 S.E.2d at 37. Defendant's argument as to prospective jurors McCoy and Smith is without merit.

Defendant next alleges that the state's peremptory challenge of prospective juror Foye was racially discriminatory. When the trial court denied defendant's *Batson* objection to Foye's dismissal, the state proceeded to give reasons for its challenge as follows:

[O]ur only desire is to have a jury that can be fair and impartial to both the State and the defendant. And, there were sufficient reasons in each case. . . . [T]he man says he was opposed to the death penalty, and then he turned around and said he could do the other. And, he's obviously—he doesn't know what he's saying, or he's too equivocal to be a reliable juror. That was our reason for excusing him.

Because the state presented reasons for its challenges despite defendant's failure to make a *prima facie* showing of racial discrimination, we proceed with our analysis under *Batson. See State v. Smith*, 352 N.C. 531, 540, 532 S.E.2d 773, 780 (2000) (reviewing court may proceed with its analysis under *Batson* and its progeny where the state presents reasons for its challenges despite the defendant's failure to establish a *prima facie* case), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 360 (2001). We next ask whether the state provided a race-neutral reason for its peremptory challenge. *See Lawrence*, 352 N.C. at 14, 530 S.E.2d at 815.

The record reveals that the state challenged prospective juror Foye because of his equivocal answers regarding the death penalty and because the state was not confident that his deliberations would

be fair to both sides.[1] The state asserted on *voir dire* of Foye that it wanted "a jury that can be fair and impartial to both the State and the defendant." A statement such as this tends to rebut an inference of discrimination. *See Golphin*, 352 N.C. at 427, 533 S.E.2d at 211. In short, the state's race-neutral reasons are more than adequate to satisfy its burden under the second prong of *Batson. See Williams*, 343 N.C. at 359, 471 S.E.2d at 387. The trial court did not err in allowing the state's peremptory challenge of prospective juror Foye.

Finally, defendant alleges that the state's peremptory challenge of prospective alternate juror Greene was racially discriminatory. As was the case for prospective jurors McCoy and Smith, the trial court found that defendant failed to make a *prima facie* showing of racial discrimination as to Greene. Our review is thus limited to determining whether the trial court's finding was in error. *See Smith*, 351 N.C. at 262, 524 S.E.2d at 37. In weighing an allegation of intentional discrimination, the reviewing court may consider the state's acceptance rate of African-American prospective jurors. *Fletcher*, 348 N.C. at 318, 500 S.E.2d at 683. We therefore determine whether the state had accepted African-American jurors at this point in the *voir dire* proceedings.

The state exercised four peremptory challenges to excuse four African-American prospective jurors out of eight questioned. The state argues, and defendant does not contest, that the state accepted four African-American jurors to serve on the jury. This acceptance rate (50%) tends to refute a *prima facie* showing of discrimination. *See id.* at 318-19, 500 S.E.2d at 683-84; *see also State v. Allen*, 323 N.C. 208, 219, 372 S.E.2d 855, 862 (1988) (41% acceptance rate of African-American jurors—seven out of seventeen tendered—failed to establish *prima facie* showing of discrimination), *sentence vacated on other grounds*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990); *State v. Abbott*, 320 N.C. 475, 481-82, 358 S.E.2d 365, 369-70 (1987) (40% acceptance rate of African-American jurors—two out of five tendered—failed to establish *prima facie* showing of discrimination); *State v. Belton*, 318 N.C. 141, 159-60, 347 S.E.2d 755, 766 (1986) (50% acceptance rate of African-American jurors—six out of twelve tendered—failed to establish *prima facie* showing of discrimination), *overruled on other*

---

1. Prospective juror Foye stated, "I don't believe in the death penalty. . . . I ain't (sic) never believed in it." When asked whether he could fairly consider both life imprisonment and death as punishments, Foye responded, "No, I couldn't." Finally, when asked whether he could nonetheless set aside his opinion and follow the law, Foye answered, "I could follow the law," and indicated that he could set aside his personal beliefs were he instructed to do so.

*grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). After analysis of the selection and composition of the jury in this case, we conclude defendant failed to make a *prima facie* showing of discrimination with respect to prospective alternate juror Greene. Thus, defendant's argument is without merit.

[3] Defendant next argues that the trial court erred by allowing the state's challenge for cause of prospective juror Ray. This dismissal, defendant alleges, violated his constitutional rights because it resulted in a death sentence imposed by a jury from which a prospective juror had been improperly excluded. Defendant further contends he should have been allowed to attempt to rehabilitate the prospective juror. He maintains additional questions would likely have elicited different answers from Ray.

A prospective juror may be excused for cause if his or her "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980), *quoted in State v. Quesinberry*, 319 N.C. 228, 235, 354 S.E.2d 446, 450 (1987). When a juror "voice[s] general objections to the death penalty or express[es] conscientious or religious scruples against its infliction," this is not, in itself, a sufficient basis for excusal. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85 (1968). A prospective juror in a capital case must be able to state clearly, however, that he or she is willing to temporarily set aside those concerns and beliefs and to fairly and impartially follow the law. *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986); *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993). The reviewing court must defer to the trial court's discretion where responses are "at best equivocal" as to whether the juror could impartially follow the law. *State v. Bowman*, 349 N.C. 459, 471, 509 S.E.2d 428, 436 (1998), *cert. denied*, 527 U.S. 1040, 144 L. Ed. 2d 802 (1999); *see also* N.C.G.S. § 15A-1212(8) (1999) (providing that a challenge for cause may be made on the grounds that a juror would be unable to render a verdict in accordance with the laws of North Carolina); *State v. Nobles*, 350 N.C. 483, 497, 515 S.E.2d 885, 893 (1999) (quoting *Wainwright v. Witt*, 469 U.S. 412, 425, 83 L. Ed. 2d 841, 852 (1985)) (holding that where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law, we defer to the final decision of the trial court).

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

Prospective juror Ray stated on *voir dire* that he was "not sure" he could fairly consider both life imprisonment without parole and the death penalty. When asked if he was against the death penalty, Ray said, "I'm not opposed, I'm not against it." Ray stated he felt his ability to render a fair and impartial decision was impaired by his prior experiences as a soldier in Vietnam: "After I came back from Viet Nam, that was enough for me for seeing murder and being around it and all. . . . I don't want to put myself in that position where I have to make that choice if I don't have to. . . . I've just seen enough of that. And, that's something I don't want to be a part of."

Prospective juror Ray was questioned at length about his ability to render a decision that complied with the law. When asked whether he could faithfully apply the law in this case, he replied, "To be honest, I really don't know. In my heart now, I'd say no." Towards the end of the state's questioning, Ray was asked:

[THE STATE]: Would you be able to sit and listen to the evidence as presented in the first phase of this trial, which would be the guilt or innocence phase . . . and be able to render a decision on guilt or innocence that would be fair to both sides?

[PROSPECTIVE JUROR RAY]: I'd really like to say yes. But the whole thing of it is, once you've come to a decision if it's against him, and then it comes up to life or death, I'm not sure if I could vote on that to take a man's life.

[THE STATE]: Well, could you return a verdict of guilty if you were satisfied, beyond a reasonable doubt, of the defendant's guilt of each charge, knowing that the defendant might receive the death penalty?

[PROSPECTIVE JUROR RAY]: To be truthful, I'm not sure.

The trial court excused Ray for cause, finding, "because of his past experiences and his personal opinions, that his ability to serve on this jury . . . and[] render a fair and impartial verdict would be prevented or substantially impaired." The trial court then denied defendant's request to rehabilitate Ray.

As a preliminary matter, we note that the trial court properly excluded prospective juror Ray for cause under the standard delineated in *Quesinberry. See* 319 N.C. at 235, 354 S.E.2d at 450. Ray stated that he had strong reservations about the death penalty and

that he questioned his ability to impose punishment fairly. Ray also left the trial judge with the definite impression that he would be unable to faithfully and impartially follow the law in the guilt-innocence phase of the trial. We therefore defer to the decision of the trial court, which ruled in its discretion that these statements would prevent or substantially impair Ray's duties as a juror. *See Brogden*, 334 N.C. at 43, 430 S.E.2d at 908.

We further hold that the trial court did not abuse its discretion when it denied defendant's request for rehabilitation. Unless the prospective juror has "expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court," the trial judge may be deemed to have abused his or her discretion for denying a rehabilitation request. *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). Nonetheless, absent a showing on appeal that further questioning by defendant would likely have produced different answers, the trial court's refusal to allow juror rehabilitation is not an abuse of discretion. *State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981).

Nowhere in the nine pages of transcript covering prospective juror Ray's *voir dire* does Ray clearly state that he could set aside his beliefs concerning the death penalty, nor does he indicate that he could fairly and impartially follow the law. *Brogden*, 334 N.C. at 43, 430 S.E.2d at 907-08. Instead, the transcript reveals that prospective juror Ray candidly related his military experience and explained why, as a result of it, he would have difficulty following the law. Defendant has failed to show how further questioning would have illuminated or changed Ray's answers. *See Oliver*, 302 N.C. at 40, 274 S.E.2d at 191. Indeed, it is possible that further questioning of prospective juror Ray, on what was to him a personal and sensitive matter, could have amounted to harassment. *See Cummings*, 326 N.C. at 307, 389 S.E.2d at 71 (denial of rehabilitation "prevents harassment of the prospective jurors based on their personal views toward the death penalty"). Accordingly, the trial court did not err in excusing prospective juror Ray for cause.

## GUILT-INNOCENCE PHASE

[4] Defendant next contends the trial court erred by denying his motion for mistrial after the trial judge discovered that one of the witnesses for the state, Deputy Moss, was serving as a courtroom bailiff. Defendant argues that Deputy Moss, when acting as bailiff, served as an officer in charge of the jury. Accordingly, defendant contends that

prejudice should have been conclusively presumed and his motion for mistrial granted.

This Court has consistently held that "where a witness for the State acts as custodian or officer in charge of the jury in a criminal trial, prejudice is conclusively presumed, and the defendant must have a new trial." *State v. Jeune*, 332 N.C. 424, 431, 420 S.E.2d 406, 410 (1992). To determine whether a witness for the state has acted as a custodian or officer in charge of the jury, "we look to factual indicia of custody and control and not solely to the lawful authority to exercise such custody or control." *State v. Mettrick*, 305 N.C. 383, 386, 289 S.E.2d 354, 356 (1982).

Where witnesses for the state have had the opportunity to engage in conversation with the jury outside of the courtroom or have been actual custodians of the jury such that the jurors were dependent on the witnesses for information or services, such contact has been deemed conclusively prejudicial regardless of whether any showing of actual prejudice is made. *See, e.g., State v. Wilson*, 314 N.C. 653, 655-56, 336 S.E.2d 76, 76-77 (1985) (contact presumed prejudicial where a spouse of the prosecutor served as bailiff and engaged in "friendly conversation" with jurors during breaks in their deliberations); *Mettrick*, 305 N.C. at 386, 289 S.E.2d at 356 (contact presumed prejudicial where witness-bailiffs transported jurors on multi-hour trips between counties such that the "jurors' lives, safety and comfort were in these officers' hands" and the jurors "were in these . . . officers' custody and under their charge out of the presence of the court for protracted periods of time with no one else present").

In contrast, when the jury's contact with witnesses for the state has been "brief, incidental, [and] entirely within the courtroom," we have held that such exposure was without legal significance and have not presumed prejudice. *State v. Flowers*, 347 N.C. 1, 21, 489 S.E.2d 391, 402 (1997) (contact not presumed prejudicial where witness-bailiff let jurors in and out of the courtroom and directed them to their seats), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998); *see also State v. Braxton*, 352 N.C. 158, 185, 531 S.E.2d 428, 444 (2000) (contact not presumed prejudicial when bailiff participated in courtroom demonstration), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *State v. Call*, 349 N.C. 382, 403, 508 S.E.2d 496, 509-10 (1998) (contact not presumed prejudicial when law enforcement witnesses passed out Bibles and told jurors which hand to raise to take their oath); *Jeune*, 332 N.C. at 432-33, 420 S.E.2d at 411 (contact not presumed prejudicial when witness-bailiff opened the jury room door

and gate to the jury box and told jurors to take their seats); *State v. Macon*, 276 N.C. 466, 473, 173 S.E.2d 286, 290 (1970) (contact not presumed prejudicial when witness-bailiffs opened the door to send jurors out or call them into the courtroom as needed).

In the present case, Deputy Moss was positioned at the back door of the courtroom for several days, and his duties included opening the doors to the courtroom as needed. He had no direct contact or communication with the jury. When alerted to Deputy Moss's dual role as witness and bailiff, the trial court relieved Deputy Moss of his duties as bailiff for the remainder of the trial.

Deputy Moss's responsibilities as bailiff for defendant's trial never required him to act in a custodial role or as the officer in charge of the jury. He was not in the presence of the jury outside of the courtroom, had no communication with the jurors, did not lead them in or out of the courtroom, and had no custodial authority over them. The exposure of the jurors to Deputy Moss in his role as bailiff appears to have been extremely limited. Accordingly, prejudice cannot be conclusively presumed, and no actual prejudice has been shown. *See Flowers*, 347 N.C. at 21, 489 S.E.2d at 402.

To support his argument for a new trial, defendant cites *Wilson*, 314 N.C. at 655-56, 336 S.E.2d at 76-77, for the principle that, solely as a result of his status as a courtroom bailiff, Deputy Moss was an officer in charge of the jury. We have stated, however, that "it is incorrect to read *Wilson* for the proposition that a bailiff in a criminal trial is *necessarily* a custodian or officer in charge of the jury so as to require a conclusive presumption of prejudice." *Jeune*, 332 N.C. at 433, 420 S.E.2d at 411. "Mere presence in the courtroom is not sufficient" to establish that the bailiff had custody of the jury. *Braxton*, 352 N.C. at 185, 531 S.E.2d at 444. A presumption of prejudice does not arise from Deputy Moss's limited exposure to the jury. In any event, the likelihood that the outcome of the trial would have been different had Deputy Moss not served as bailiff is negligible. Accordingly, any constitutional error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1999). This argument fails.

[5] Defendant next contends that his rights were violated when the trial court limited his ability to present evidence showing he acted in self-defense. Defendant testified that at the trailer, he felt trapped, feared for his life, and heard gunfire. He argues that the excluded evidence, including the testimony of two expert witnesses, would tend

to show that he fired his gun in response to a perceived threat of imminent death or serious injury to himself.

At trial, defendant attempted to introduce the testimony of Dr. Lubica Fedor (Dr. Fedor), a staff psychiatrist at the Edgecombe-Nash Mental Health Center who had evaluated defendant on 15 July 1997. Defendant contends that Dr. Fedor's testimony was relevant to show defendant's state of mind on the day of the shootings and, in particular, to show defendant's perception of the need to use deadly force to defend himself. The trial court did not allow Dr. Fedor to testify.

We first note that the trial court erred by instructing the jury on self-defense. This Court has held that a defendant is entitled to a self-defense instruction "if there is any evidence in the record from which it can be determined that it was necessary or reasonably appeared to be necessary for him to kill his adversary in order to protect himself from death or great bodily harm." *State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982). If, however, no such evidence is presented, a defendant is not entitled to an instruction on self-defense. *Id.* In the present case, there was no evidence to support a finding that defendant in fact formed a belief that it was necessary to kill either his wife or Chief Hathaway to protect himself from death or serious injury. Defendant testified that he felt afraid and fired two shots into the floor of the trailer as he ran outside. He asserted that he did not intend to hit anyone and denied shooting either his wife or Chief Hathaway. Defendant further testified he was not in a position to have been able to cause the wounds that killed his wife, even when he was firing his weapon, and speculated that her stepfather, Mr. Badger, was actually responsible for the killings.

To recall the words of a recent case,

> defendant is not entitled to an instruction on self-defense while still insisting that he did not fire the pistol at anyone, that he did not intend to shoot anyone and that he did not [know anyone had been shot]. Clearly, a reasonable person believing that the use of deadly force was necessary to save his or her life would have pointed the pistol at the perceived threat and fired at the perceived threat. The defendant's own testimony, therefore, disproves the first element of self-defense.

*State v. Williams*, 342 N.C. 869, 873, 467 S.E.2d 392, 394 (1996) (defendant claimed he only shot warning shots and did not intend to hit anyone); *see also State v. Lyons*, 340 N.C. 646, 662, 459 S.E.2d 770,

779 (1995) ("from defendant's own testimony regarding his thinking at the critical time, it is clear he meant to scare or warn and did not intend to shoot anyone," but rather intended to shoot at the top of a door); *State v. Reid*, 335 N.C. 647, 671, 440 S.E.2d 776, 789-90 (1994) (defendant cannot claim self-defense while also asserting that he did not aim his gun at the victim and did not hold the weapon that killed the victim); *Bush*, 307 N.C. at 159-60, 297 S.E.2d at 568 ("defendant's self-serving statements that he was 'nervous' and 'afraid' and that he thought he was 'protecting [him]self' " did "not amount to evidence that the defendant had formed any subjective belief that it was necessary to kill the deceased in order to save himself from death or great bodily harm") (emphasis omitted).

Defendant contends that Dr. Fedor's testimony would have helped the jury understand why defendant felt it necessary to use deadly force to protect himself against his alleged attackers. Nonetheless, because defendant's own testimony showed he did not believe it necessary to use deadly force against any individuals to protect himself, the expert testimony of Dr. Fedor was irrelevant. Defendant was not entitled to introduce expert testimony to bolster a defense which was not supported by the evidence at trial. *See Williams*, 342 N.C. at 873, 467 S.E.2d at 394.

Further, "[w]hen a trial court undertakes to instruct the jury on self-defense in a case in which no instruction in this regard is required, the gratuitous instructions on self-defense are error favorable to defendant." *Reid*, 335 N.C. at 672, 440 S.E.2d at 790. The self-defense instruction defendant received in this case was a benefit to which he was not entitled. Accordingly, defendant may not now complain that because the jury considered self-defense, he should have received the additional benefit of Dr. Fedor's testimony in support of that defense. Further, even assuming *arguendo* that it was error to exclude testimony supporting defendant's self-defense claim while allowing the jury to be instructed on self-defense, we again note that the self-defense instruction was not justified by the facts of this case. Because the unwarranted instruction helped, rather than hindered, defendant's case, he was not prejudiced by the exclusion of Dr. Fedor's testimony. *See id.* This argument is without merit.

In a similar vein, defendant argues that he should have been allowed to introduce the testimony of Dr. James Bellard, a forensic psychiatrist. Defendant argues that Dr. Bellard's testimony, like that of Dr. Fedor, was relevant to the issue of self-defense because it would have shed light on defendant's state of mind at the time of the

killings and on his perception that he was in imminent danger. For the same reasons that he was not prejudiced by the exclusion of Dr. Fedor's testimony, defendant was not prejudiced by the exclusion of Dr. Bellard's testimony. As discussed above, defendant was not entitled to an instruction on self-defense. *See Williams*, 342 N.C. at 873, 467 S.E.2d at 394. Dr. Bellard's testimony was therefore irrelevant to the issues at trial. The instruction given by the trial court inured only to defendant's benefit, and he was not entitled to present additional evidence in support of a defense not warranted by the evidence. *See Reid*, 335 N.C. at 671-72, 440 S.E.2d at 789-90. Accordingly, defendant's argument is without merit.

[6] Defendant also asserts that the trial court erroneously granted the state's motion *in limine*, which prohibited defendant from introducing evidence concerning alleged embezzlement by Mrs. Nicholson from her employer, Tim's Auto Sales. Defendant contends that he was entitled to introduce this evidence to explain the great stress he was experiencing at the time of the killings and to bolster his claim of self-defense.

The state filed its motion *in limine* on the morning of 2 November 1999, the second day of trial. The state requested that the trial court prohibit defendant from questioning witnesses about the alleged embezzlement on the grounds that it was unproven and irrelevant and would therefore be prejudicial. Before bringing the jury into the courtroom, the trial court discussed the motion with the parties. The state explained why it hoped to prohibit that line of questioning, and the following colloquy occurred:

THE COURT: Okay. Does the defense wish to be heard?

[DEFENSE COUNSEL]: Judge, I don't know that now is the time to get into it or not. Certainly from what I can glean—

THE COURT: Well, let me—

[DEFENSE COUNSEL]: —the type of witnesses coming up at this time, none of that certainly would, at this point in time.

THE COURT: Okay. Let—

[DEFENSE COUNSEL]: Probably the interest of justice would be served to move on, but I will guarantee the Court that we will not, not until we have the opportunity to have the Motion heard.

THE COURT: Okay. That's what I was getting at.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: Before, the best way to handle these Motions in Limine, before you get to that point, before you folks raise that issue, I expect you to come to the bench, let's talk about it, and then I'll make a decision at that point in time.

It's understood from that (indicating) side that that will not be raised until such time as you have approached the bench and gotten permission to do so, and if necessary, we've had a hearing about that.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: Okay. Okay. That's good enough for now.

The issue did not arise again until the presentation of defendant's evidence, when defendant called Dennis Harper, a former employee of Tim's Auto Sales. Harper testified that he had worked with defendant and Mrs. Nicholson at Tim's Auto Sales and explained what he knew about the Nicholsons' relationship. Harper testified that both of the Nicholsons had stopped working at Tim's Auto Sales and recounted a time when defendant returned to talk to the store owner. The following exchange occurred:

[DEFENSE COUNSEL]: When you say he was stressed out, what do you mean—he was under stress, what do you mean by that;

Explain to the jury what you mean?

[HARPER]: Well, they both had lost their jobs, well, I think [defendant] just went ahead and quit.

[THE STATE]: I'm going to OBJECT.

THE COURT: Well.

[THE STATE]: He didn't ask him that.

THE COURT: OVERRULED.

Defense counsel then asked to approach the bench, and all parties conferred out of the hearing of the jury.

[DEFENSE COUNSEL]: I know you don't want me to get into that area. I didn't mean for him to go into that, so if you want me to approach him and tell him not to go into that.

THE COURT: I want you to instruct the witness not to go into that.

Defense counsel then asked Harper to try to avoid testifying about why Mrs. Nicholson left her employment at Tim's Auto Sales. Harper said he understood, and resumed testifying once the attorneys had returned to their respective counsel tables.

These transcript excerpts illustrate that on 2 November 1999 the trial court discussed the state's motion *in limine* with the parties and inquired into whether the motion should be heard. Defense counsel advised the trial court there was not a need for a hearing at that time. Defense counsel further volunteered that he would not inquire into the alleged embezzlement until the motion was heard. Defense counsel agreed that, before entering into such inquiry when examining witnesses, he would approach the bench and request permission from the trial court. The trial court indicated it would conduct a hearing at that time if necessary.

At the time Harper began to testify about why the Nicholsons might have left their employment at Tim's Auto Sales, the state objected on the basis that Harper's answer was nonresponsive. The trial court overruled the objection. At the bench, defense counsel told the trial court he had not intended to inquire into the alleged embezzlement. Defense counsel did not request permission to enter into such an inquiry, nor did he ask to have a hearing on the subject at that time.

It does not appear from the above, and there is nothing in the record to show, that the trial court ever granted the state's motion *in limine*. Rather, it appears the trial court merely postponed ruling until defendant indicated he was interested in entering into that line of inquiry. Defendant never so indicated and in fact told the trial court he was not attempting to inquire about the alleged embezzlement during the examination of Harper. The trial court thus never ruled on the motion *in limine*, as the need never arose. Accordingly, defendant's argument that the trial court erred in granting the motion *in limine* is without merit.

[7] Defendant's next argument concerns the admission of statements made by the victim, Mrs. Nicholson. Defendant maintains that these statements constituted inadmissible hearsay. He contends that the trial court improperly relied upon the catchall hearsay exception, N.C.G.S. § 8C-1, Rule 804(b)(5) (1999), in admitting the challenged

statements without first engaging in the inquiry required by *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986).

The challenged statements were offered by Ella Badger, the victim's mother. Mrs. Badger testified that she heard defendant and Mrs. Nicholson whispering in the back of the car during the trip to the hospital on the evening of 16 July 1997. She could not understand what they were saying until her daughter said to defendant, "No. No. No. I ain't gonna (sic) do it. I don't want that." Then Mrs. Nicholson said, "Daddy, Abner Ray back here talking about he got a gun, and he gonna (sic) kill me." Mrs. Badger also testified that on the day of the killings, her daughter told her that she wanted to go home to get some clothes. Once Mrs. Nicholson arrived at home, she called her mother and told her that she had talked to defendant and asked him to come get his clothes. According to Mrs. Badger, her daughter told her that defendant did not want anyone else at the house when he came to pick up his clothes. Mrs. Nicholson spoke to her mother one more time before her death to tell her that she had called the police and that they had advised her not to let defendant into the house, but to call them back once he arrived.

The prohibition against hearsay bars the admission of out-of-court statements offered to prove the truth of the matter asserted. N.C.G.S. § 8C-1, Rule 801(c) (1999). Numerous exceptions to the hearsay rule exist, however, so that out-of-court statements may be admissible under some circumstances. Rule 803(2), pertaining to "excited utterances," is one such exception. N.C.G.S. § 8C-1, Rule 803(2) (1999). The excited utterance hearsay exception allows admission of out-of-court statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* To qualify as an excited utterance, the statement must relate " '(1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.' " *State v. Maness*, 321 N.C. 454, 459, 364 S.E.2d 349, 351 (1988) (quoting *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985)).

Rule 803(3) provides another exception to the hearsay rule, under which a statement may be offered for the purpose of showing "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." N.C.G.S. § 8C-1, Rule 803(3). This Court has interpreted Rule 803(3), the "state of mind" hearsay exception, to include statements of then-existing intent to engage in future acts.

*Braxton*, 352 N.C. at 190, 531 S.E.2d at 447; *State v. Taylor*, 332 N.C. 372, 386, 420 S.E.2d 414, 422 (1992). The Rule 803(3) exception is limited by the requirement that the evidence be relevant to the case. *State v. Meekins*, 326 N.C. 689, 695, 392 S.E.2d 346, 349 (1990).

In the absence of a more specific exception, otherwise inadmissible hearsay may be introduced under the catchall hearsay exception when the declarant is unavailable. N.C.G.S. § 8C-1, Rule 804(b)(5) (1999). Courts must carefully scrutinize evidence offered under the catchall exception, as its residual nature makes it a potential avenue for abuse. *State v. McElrath*, 322 N.C. 1, 16, 366 S.E.2d 442, 451 (1988).

Mrs. Badger overheard Mrs. Nicholson's statements, "No. No. No. I ain't gonna (sic) do it. I don't want that," and, "Abner Ray back here talking about he got a gun, and he gonna [sic] kill me." These statements are excited utterances, made under the stress caused by defendant, who at that time was allegedly threatening the victim in the back of the Badgers' car, and made spontaneously, not as a product of reflection. *See Maness*, 321 N.C. at 459, 364 S.E.2d at 351. Rule 803(2) therefore allows the admission of these statements into evidence.[2] Also admitted into evidence were Mrs. Nicholson's statements regarding her desire to go home to get some clothes, her request to defendant to come get his clothes, and her assertion that she had called the police to serve defendant with a warrant. These statements fall under the state of mind exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3). They are relevant to show the sequence of events on the day of the killings. *See Meekins*, 326 N.C. at 695, 392 S.E.2d at 349. Further, they illustrate Mrs. Nicholson's then-existing intent to protect herself by calling the police and having defendant served with the warrant. *See* N.C.G.S. § 8C-1, Rule 803(3); *Braxton*, 352 N.C. at 190, 531 S.E.2d at 447. Although defendant asserts that the trial court improperly admitted these statements under the Rule 804(b)(5) catchall exception, our review of the record convinces us otherwise. The admission of these statements was proper under the hearsay exceptions detailed in Rules 803(2) and 803(3), and not the

---

2. In the transcript of this exchange, Mrs. Badger testified that defendant said, "I was lying. I ain't got no gun." It is unclear whether defendant contests the admission of his alleged statement. Assuming that he does contest its admission, the trial court did not err in allowing it because this statement falls within the hearsay exception for admissions by a party-opponent. N.C.G.S. § 8C-1, Rule 801(d) ("A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is (A) his own statement, in either his individual or a representative capacity . . . .").

catchall hearsay exception in Rule 804(b)(5). This argument is therefore without merit.

[8] Defendant next challenges the trial court's denial of his motion to dismiss the two first-degree murder charges. He argues that the state did not present sufficient evidence to show premeditation and deliberation. Rather, defendant asserts that the state's evidence showed only that Mrs. Nicholson had concocted a "bizarre plan" to lure defendant to the trailer and that he was surprised by the presence of Mrs. Nicholson's family and Chief Hathaway. Defendant argues that, under these circumstances, he could not have formed the deliberate and premeditated intent to kill.

The standards guiding our inquiry on this issue are well established. "In ruling on a motion to dismiss a charge of first-degree murder, the trial court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from that evidence." *State v. Ross*, 338 N.C. 280, 287, 449 S.E.2d 556, 562 (1994). Substantial evidence must exist for each element of the offense, and there must also be substantial evidence tending to show that defendant committed the crime. *State v. Carter*, 335 N.C. 422, 429, 440 S.E.2d 268, 271 (1994). Should the state fail to present substantial evidence for each element of first-degree murder, a court should grant a motion to dismiss the charge. *See id.*

First-degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation. N.C.G.S. § 14-17 (1999); *State v. Misenheimer*, 304 N.C. 108, 282 S.E.2d 791 (1981). The element of premeditation requires the state to show that the accused formed the specific intent to kill at some time, however brief, before the killing took place. *Misenheimer*, 304 N.C. at 113, 282 S.E.2d at 795. Deliberation is the intention to kill, and it must be formed not in the heat of passion, but while defendant is in a " 'cool state of blood.' " *State v. Leazer*, 353 N.C. 234, 238, 539 S.E.2d 922, 925 (2000) (quoting *State v. Thomas*, 350 N.C. 315, 347, 514 S.E.2d 486, 506, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999)); *see also State v. Buffkin*, 209 N.C. 117, 126, 183 S.E. 543, 548 (1936).

Defendant argues that the surprise deliberately sprung upon him by his wife negated the premeditation and deliberation element of first-degree murder. We disagree. Viewing the evidence in the light most favorable to the state, the record shows the killings were premeditated and deliberate. The state presented testimony that defend-

ant and his wife had been having marital difficulties near the time of the killings. Mrs. Nicholson told her parents that defendant had choked her on one occasion and had threatened to kill her on another. On 16 July 1997, one day prior to the killings, defendant retrieved his pistol from the pawnshop where he had previously pawned it. The state presented eyewitness testimony that defendant punched Mrs. Nicholson in the mouth later that same day.

When Mrs. Nicholson asked defendant to come to the trailer on the day of the killings, defendant requested that she be alone when he arrived, and he brought along his gun. The evidence also showed that defendant shot Chief Hathaway in the face as the Chief tried to serve him with a warrant. Although events undoubtedly unfolded quickly in the trailer that day, the fact that the Chief's sidearm was still in its holster when he was shot supports the premeditation element. The state presented evidence tending to show that Mrs. Nicholson ran from defendant as he chased her with his gun and that he shot her after she tripped and fell onto the floor. Evidence was also presented that defendant fired at least five shots that day, most of them at close range, and that he fled the scene after the killings, disposing of the gun along the way. This evidence, considered in the light most favorable to the state, tend to show the killings were premeditated and deliberate. *See Ross*, 338 N.C. at 287, 449 S.E.2d at 562.

Even if we accept defendant's argument that the events on the day of the crime are "unclear at best," we cannot hold that defendant's motion to dismiss should have been granted. Just because the facts of a case are contested and the evidence is circumstantial does not mean that those facts are insufficient to be submitted to a jury, nor does it mean that, viewed in their totality, those facts cannot constitute substantial evidence. *See, e.g., Carter*, 335 N.C. at 429, 440 S.E.2d at 271. We therefore hold that, considered in the light most favorable to the state, substantial evidence of premeditation and deliberation supported the trial court's decision to deny defendant's motion to dismiss and to submit the two first-degree murder charges. *See id.* Accordingly, defendant's argument fails.

## CAPITAL SENTENCING PROCEEDING

Defendant presents two separate arguments concerning the presentation of impact statements during the capital sentencing proceeding. Defendant argues that the trial court caused him undue prejudice by allowing the state to present a victim-impact statement. Further, defendant argues that the trial court improperly

denied his request to present family-impact evidence. He asserts that such evidence would establish his identity as an individual whose death would represent a unique loss to society and his family. Furthermore, according to defendant, fairness dictated that his family-impact evidence be admitted to rebut the victim-impact evidence admitted. For purposes of our analysis, we combine these two assignments of error.

[9] The state presented testimony by Mrs. Nicholson's mother, Ella Badger, describing the effect Mrs. Nicholson's death had on Mrs. Nicholson's children, on the victim's brother, and on herself and her husband. Mrs. Badger related how her granddaughter—Mrs. Nicholson's daughter—now lacked the mother figure upon whom she had always relied. She also described the effects on her son Jarrin— Mrs. Nicholson's brother—who was an eyewitness to the murder. He cried constantly, could not bear to turn the lights off, and began to do poorly in school. Mrs. Badger also related that she and her daughter were very close. The trial court allowed this victim-impact statement into evidence over defendant's objection.

In *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991), the United States Supreme Court held that victim-impact statements are admissible and relevant to the jury's decision whether to impose the death penalty. North Carolina has adopted this rule to allow evidence of victim impact in sentencing hearings. "A victim has the right to offer admissible evidence of the impact of the crime, which shall be considered by the court or jury in sentencing the defendant. The evidence may include . . . [a] description of the nature and extent of any physical, psychological, or emotional injury suffered by the victim as a result of the offense committed by the defendant." N.C.G.S. § 15A-833(a)(1) (1999). The admissibility of victim-impact statements is limited by the requirement that they not be "so prejudicial as to 'render[] the [trial] fundamentally unfair.' " *Smith*, 352 N.C. at 554, 532 S.E.2d at 788 (quoting *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735) (first alteration in original). Our courts have interpreted section 15A-833 to bar evidence that would "sway the sentencing jury to improper considerations in determining defendant's sentence." *Id.* (holding no undue prejudice arose from family member's statements that he felt he had "lost a confidant[e]" and that a "predator had come and taken one of two sibling birds out of the nest").

Mrs. Badger's statements concerning the impact of her daughter's death on her family were not unduly prejudicial. Her description of

her own reaction and the reactions of her family members related the extent of the psychological and emotional injury caused by defendant, falling well within the parameters of the statute. N.C.G.S. § 15A-833; *see also Bowman*, 349 N.C. at 478, 509 S.E.2d at 440 (holding that victim-impact statements by the mothers of the two victims concerning how the murders affected them and their families were not so unduly prejudicial that they rendered the trial fundamentally unfair). Mrs. Badger's statements addressed the " 'specific harm caused by the defendant,' " *Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, and " 'remind[ed] the sentencer that . . . the victim is an individual whose death represents a unique loss to society and in particular to [her] family,' " *id.* (quoting with approval *Booth v. Maryland*, 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457 (1987) (White, J., dissenting), *overruled by Payne*, 501 U.S. 808, 96 L. Ed. 2d 720). *Accord Smith*, 352 N.C. at 554, 532 S.E.2d at 788. In our examination of the record, we have found no evidence showing that the jury was swayed to base its decision solely on Mrs. Badger's statements. *See id.* None of the aggravating circumstances submitted to the jury derived from the victim-impact evidence, and the state did not ask the jury to base its decision on this evidence. *See, e.g., Bowman*, 349 N.C. at 478, 509 S.E.2d at 439-40. The trial court thus properly admitted the victim-impact statement.

**[10]** Defendant also argues that the trial court committed prejudicial error by denying his offer to present evidence showing how his death would affect his family. We disagree. In a capital prosecution, the proper scope of mitigation extends to "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). Mitigating circumstances include extenuating factors, factors that reduce the moral culpability of the killing, and factors that make the killing less deserving of the death sentence than other first-degree murders. *Bowman*, 349 N.C. at 479, 509 S.E.2d at 440. The rule allowing mitigating circumstances, however, does not function to " 'limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense.' " *Id.* (quoting *Lockett*, 438 U.S. at 604 n.12, 57 L. Ed. 2d at 990 n.12) (alteration in original).

The *voir dire* testimony of defendant's sister-in-law as to the stress and sickness besetting her family since the time of the killing did not go to any aspect of defendant's character, record, or

## STATE v. NICHOLSON

[355 N.C. 1 (2002)]

circumstance of the offense. *See id.* We do not doubt the veracity or sincerity of the statements made by defendant's sister-in-law. Testimony concerning the mental and physical condition of defendant's family, however, does not reduce his moral culpability, nor does it illuminate the events of 17 July 1997. *See id.* The trial court therefore did not abuse its discretion in excluding the family-impact statements as irrelevant. These assignments of error concerning victim-impact evidence and family-impact evidence are without merit.

Defendant next argues that the trial court erred in allowing the state to make improper closing arguments during the capital sentencing proceeding. Defendant challenges the state's reference to his possible future conduct and his courtroom demeanor in its closing argument. He asserts that the trial court should have intervened *ex mero motu* when the state told the jury that it represented the "voice and conscience of the community." Finally, defendant appears to challenge the state's use of victim-impact evidence in its closing argument.[3] We consolidate these assignments of error for discussion herein.

When, as in the instant case, defendant fails to object during closing argument,

> our review is limited to whether the argument was so grossly improper as to warrant the trial court's intervention *ex mero motu. State v. Cummings*, 353 N.C. 281, 296-97, 543 S.E.2d 849, 859, *cert. denied,* —— U.S. ——, —— L. Ed. 2d —— 70 U.S.L.W. 3268 (2001)). Under this standard, "[o]nly an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied,* 519 U.S. 890, 136 L. Ed. 2d 160 (1996). "[D]efendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.'"

---

3. Defendant states that he filed a pretrial motion *in limine* to exclude victim-impact evidence. A motion *in limine* is insufficient to preserve for appeal the question of the admissibility of the challenged evidence when the defendant failed to object to that evidence at the time it was offered at trial. *State v. Grooms*, 353 N.C. 50, 540 S.E.2d 713 (2000), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3235 (2001). We therefore review the state's argument for gross impropriety. *See Golphin*, 352 N.C. at 452, 533 S.E.2d at 226.

*State v. Davis,* 349 N.C. [1,] 23, 506 S.E.2d [455,] 467 [(1998), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)].

*State v. Anthony,* 354 N.C. 372, 427-28, 555 S.E.2d 557, 592 (2001).

As a general rule, counsel possess wide latitude "to argue the facts which have been presented, as well as reasonable inferences that may be drawn therefrom." *State v. Williams,* 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). In a capital case, the state may argue the possibility that the defendant could pose a danger to prison staff and inmates. *State v. Steen,* 352 N.C. 227, 279, 536 S.E.2d 1, 31 (2000), *cert. denied,* 531 U.S. 1167, 148 L. Ed. 2d 997 (2001). This Court has held that it is proper for the state to urge the jury to recommend death specifically to deter the defendant from committing another murder. *State v. Syriani,* 333 N.C. 350, 397, 428 S.E.2d 118, 144, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Argument may also focus on the defendant's demeanor as displayed throughout the trial. *See State v. Flippen,* 349 N.C. 264, 276, 506 S.E.2d 702, 710 (1998), *cert. denied,* 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999).

[11] Defendant challenges two comments made by the state concerning defendant's possible future conduct and his courtroom demeanor. The state noted, "[I]f [defendant is] sentenced to live in prison, we can't even be sure he's not going to kill again. . . . [W]hat happens when he is pushed to his limits?" The state then told the jury, "[Y]ou've had an opportunity to see [defendant]. There have been some downright emotional moments in this trial. Didn't seem to bother him (indicating). He looks bored to me. Now, ladies and gentlemen, if he doesn't care what happens to him, why should you?" Defendant asserts that these arguments inflamed the jury and introduced prejudice into his trial.

The statements contested by defendant did not cross the line into improper argument. The state's comment on the possibility of defendant's future dangerousness to prison staff and inmates was appropriate under our holding in *Steen,* 352 N.C. at 279, 536 S.E.2d at 31. Similarly, the state engaged in permissible argument when it exhorted the jury to recommend death specifically to deter defendant from committing another murder. *See Syriani,* 333 N.C. at 397, 428 S.E.2d at 144. Furthermore, the state acted within the bounds of propriety when it characterized defendant as seeming "bored" with the courtroom proceedings. *See Flippen,* 349 N.C. at 276, 506 S.E.2d at 710 (holding that state's argument referring to defendant's conduct as "sniveling" was not improper). The state's remarks pertaining to

defendant's courtroom conduct were permissible because his demeanor was " 'before the jury at all times.' " *Id.* (quoting *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980)). We therefore find no error in the trial court's failure to intervene *ex mero motu* during these portions of the state's closing argument. *See Golphin*, 352 N.C. at 452, 533 S.E.2d at 226.

[12] Defendant next challenges two of the state's references to the jury as the voice of the community. The state told the jury that "these innocent families, people who are served by a good and faithful Police Chief, are waiting for your sentence. Let your sentence . . . send a message to all innocent mothers, to all law enforcement officers, and to all citizens . . . as to what value you have placed on the lives of [the victims]." The state later reminded the jury that it was "the voice and conscience of the community." Defendant contends that the state's argument invited the jurors to ignore the evidence and substitute themselves for the victim's family and the community as a whole. In this argument, defendant appears to assign error to the state's closing argument by challenging the state's use of victim-impact evidence along with its exhortation to the jury to act as the voice of the community.

This Court has upheld arguments that remind the jury that its verdict will send a message to the community or function as the conscience of the community. *Id.* at 471, 533 S.E.2d at 237; *cf. State v. Boyd*, 311 N.C. 408, 418, 319 S.E.2d 189, 197 (1984) (jury's decision cannot be based upon the jury's perceived accountability to the witnesses, to the victim, to the community, or to society in general), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985). Indeed, "[p]ermitting the jury to act as the voice and conscience of the community is required because the very reason for the jury system is to temper the harshness of the law with the 'commonsense judgment of the community.' " *State v. Scott*, 314 N.C. 309, 311-12, 333 S.E.2d 296, 298 (1985) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 530, 42 L. Ed. 2d 690, 698 (1975)). The state may not, however, encourage the jury to consider outside factors, such as public sentiment, in its deliberations. *See Golphin*, 352 N.C. at 471, 533 S.E.2d at 237 (noting that "[t]he State cannot encourage the jury to lend an ear to the community").

Our thorough examination of the record leads us to disagree with defendant's characterization of this portion of the state's argument as grossly improper and prejudicial. As it did in *Golphin*, the state in the present case properly reminded the jury that its verdict would "send

a message" to the community. *Id.* The state did not exhort the jury to take into account the specific expectations of the community or the family in coming to a decision. Rather, the state's characterization of the jury as the voice of the community counseled jury members to act in their appropriate role as " 'instruments of public justice.' " *Scott,* 314 N.C. at 311, 333 S.E.2d at 297 (quoting *Smith v. Texas,* 311 U.S. 128, 130, 85 L. Ed. 84, 86 (1940)). The state's argument based on victim-impact evidence did not rise to the level of gross impropriety such that defendant's due process rights were prejudiced. *See Golphin,* 352 N.C. at 452, 533 S.E.2d at 237; *see also State v. Conaway,* 339 N.C. 487, 528, 453 S.E.2d 824, 850 (citing *Payne,* 501 U.S. at 825, 115 L. Ed. 2d at 735), *cert. denied,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995). The trial court therefore did not err in failing to intervene *ex mero motu,* and defendant's arguments are without merit.

**[13]** Defendant next alleges impropriety in the state's closing argument concerning remuneration of defendant's expert witnesses. Defendant contends he was prejudiced by the state's assertion that defendant's witnesses would not get paid unless they said what defendant wanted to hear.

"[C]ompensation of a defendant's expert witness is clearly an appropriate matter for cross-examination." *Atkins,* 349 N.C. at 83, 505 S.E.2d at 110. This is especially true where discrepancies exist between the opposing parties' experts or where conflicting diagnoses are made; in such cases, the parties may elicit testimony indicative of witness bias. *See id.* at 83, 505 S.E.2d at 110-11. As noted above, counsel are allowed wide latitude in choosing the substance of their closing arguments. *See, e.g., Williams,* 317 N.C. at 481, 346 S.E.2d at 410. "[I]t is not improper for the prosecutor to impeach the credibility of an expert [in] closing argument." *State v. Norwood,* 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied,* 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

Defendant argues that the trial court erred in overruling his objection to the state's closing argument. In the portion of the transcript defendant references, the state argues that defendant's experts "will say whatever they want to say because they don't get paid . . . unless they say what they (indicating) want to hear." Defendant contends that this was an improper attack upon the credibility of his experts.

After careful review of the challenged portions of the transcript, we conclude that there was no error. The state's closing argument

simply illustrated discrepancies between the diagnoses made by Dr. Wolfe and Dr. Warren, two of defendant's expert witnesses. The state asked the jury to consider whether these witnesses were biased. It pointed out that

> if they are biased, then you have to consider really hard what they said. . . . Now, Doctor Warren, when he tested [defendant], he was a seventy-five [IQ] . . . when they give their analysis and their diagnosis, do they use the seventy-five? No. There is no word mentioned in those two reports they have. What they talked about is the sixty-six [IQ], because that's lower. . . . Now, pose that against what . . . Doctor Wolfe said. Who is being objective, who is being subjective?

The experts' conflicting testimony prompted the state to question their credibility and impartiality in its closing argument. Because it was not improper for the state to impeach defendant's experts in this manner, this argument is without merit.

**[14]** Defendant next assigns error to the trial court's submission of the (e)(4) aggravating circumstance—that the murder was committed for the purpose of avoiding or preventing a lawful arrest—in the case involving Chief Hathaway. *See* N.C.G.S. § 15A-2000(e)(4) (1999). Defendant contends this aggravating circumstance was unsupported by the evidence, which allegedly showed only the bare fact of the killing itself and not any attempt to avoid arrest.

Submission of the (e)(4) aggravating circumstance is proper where the trial court finds "substantial, competent evidence in the record from which the jury can infer that at least one of defendant's purposes for the killing was the desire to avoid subsequent detection and apprehension for a crime." *State v. Hardy*, 353 N.C. 122, 135, 540 S.E.2d 334, 344 (2000), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3235 (2001). In determining whether "to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom." *Syriani*, 333 N.C. at 392, 428 S.E.2d at 141.

The state presented evidence that on 16 July 1997, defendant threatened and assaulted Mrs. Nicholson. Mrs. Nicholson called the police, and defendant ran off when an officer arrived. Mrs. Nicholson went to the magistrate's office and swore out a warrant that night. The next day, when defendant called Mrs. Nicholson, he told her not

to have the "law" or anyone else at the trailer when he arrived to get his clothes. Mrs. Nicholson then called the police department and asked if an officer could be present at her home when defendant came over. Chief Hathaway returned her call, explained he was coming to her house, and told Mrs. Nicholson he had a warrant for defendant's arrest.

Before he went to the trailer, defendant called Mrs. Nicholson again and asked if there was anyone else at the trailer. After Mrs. Nicholson said there was no one else there, defendant went to the trailer. While he waited outside, Mrs. Nicholson called the police. She then let defendant inside to get his clothes. Chief Hathaway responded to the call from the Nicholsons' trailer and told the town clerk as he left that he was on his way to serve the warrant. When Chief Hathaway arrived at the trailer, Mr. Badger looked outside and saw that he had a piece of paper in his hand.

Chief Hathaway knocked on the front door to the trailer, and Mrs. Nicholson told him to come inside. He was dressed in his police uniform. He walked up to defendant, who was on his way to the back bedroom. Chief Hathaway told defendant that he had a warrant for his arrest. The state's evidence showed that defendant turned around, pushed Chief Hathaway away, and shot him in the face. Chief Hathaway's gun was in its holster when he was shot.

We conclude the state presented substantial evidence from which a jury could reasonably conclude that one of the reasons defendant killed Chief Hathaway was to avoid arrest. In the light most favorable to the state, this evidence tends to show that defendant knew the police were looking for him as a result of his assault on his wife on 16 July. Defendant's departure when police responded after the assault, his demand that no police be at the trailer when he arrived, and his repeated phone calls to question whether in fact there was anyone else at the trailer before he arrived all tend to show that defendant was attempting to avoid arrest. The evidence also shows that Chief Hathaway went to Mrs. Nicholson's trailer on 17 July to arrest defendant for assaulting his wife and that when he informed defendant he had a warrant for his arrest, defendant shot him. The jury could reasonably conclude, based on this evidence of record, that one of the reasons defendant shot Chief Hathaway was to avoid arrest. *See Hardy*, 353 N.C. at 135, 540 S.E.2d at 344. Thus, the trial court did not err in submitting the (e)(4) aggravating circumstance to the jury. Defendant's argument is without merit.

[15] In his next argument, defendant asserts that the trial court erroneously submitted the (e)(8) aggravating circumstance—"[t]he capital felony was committed against a law-enforcement officer . . . while engaged in the performance of his official duties or because of the exercise of his official duty"—in the case involving Chief Hathaway. *See* N.C.G.S. § 15A-2000(e)(8). Submission of the (e)(8) aggravating circumstance must be supported by substantial evidence. *See Fletcher*, 348 N.C. at 323, 500 S.E.2d at 686.

Defendant argues that it was error for the court to submit the (e)(8) aggravating circumstance under the "engaged in" prong because the evidence was insufficient to show defendant knew that Chief Hathaway was engaged in the performance of any official duty on the date of the killings. This Court has never addressed whether the trial court may submit the (e)(8) aggravating circumstance under the "engaged in" prong in the absence of evidence tending to show the defendant knew or had reasonable grounds to know that the victim was a law enforcement officer.

In any event, the evidence in the instant case clearly shows that Chief Hathaway was engaged in his official duties as a law enforcement officer at the time of the killing. At trial, the state offered evidence tending to show that Chief Hathaway arrived at the trailer in uniform and in the course of his official duties. Moreover, defendant himself testified that during his encounter with Chief Hathaway, Chief Hathaway told defendant that he was serving a warrant for defendant's arrest. The evidence shows not only that defendant shot an officer who was engaged in the performance of his official duties, but also that defendant was fully aware the officer was performing his official duties at the time defendant fired his gun. This evidence therefore constituted substantial evidence supporting the trial court's submission of the (e)(8) aggravator. Accordingly, defendant's argument is meritless.

[16] Defendant next argues that the trial court erroneously submitted two aggravating circumstances based on the same evidence in the case involving Chief Hathaway. Defendant contends the evidence supporting submission of N.C.G.S. § 15A-2000(e)(4), that the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, completely overlapped and duplicated the evidence supporting the submission of N.C.G.S. § 15A-2000(e)(8), that the capital felony was committed against a law enforcement officer engaged in the performance of his official duties.

This Court has held:

It is error to submit two aggravating circumstances resting on the same evidence. . . . "Where, however, there is separate evidence supporting each aggravating circumstance, the trial court may submit both 'even though the evidence supporting each may overlap.' " *State v. Rouse*, 339 N.C. 59, 97, 451 S.E.2d 543, 564 (1994) (quoting *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993)), *cert. denied*, [516] U.S. [832], 133 L. Ed. 2d 60 (1995). "Aggravating circumstances are not considered redundant absent a *complete* overlap in the evidence supporting them." [*State v.*] *Moseley*, 338 N.C. [1,] 54, 449 S.E.2d [412,] 444 [(1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995)] (emphasis added).

*State v. Wilkinson*, 344 N.C. 198, 227-28, 474 S.E.2d 375, 391 (1996). We also have determined that "there is no error in submitting multiple aggravating circumstances provided that the inquiry prompted by their submission is directed at distinct aspects of the defendant's character or the crime for which he is to be punished." *State v. Hutchins*, 303 N.C. 321, 354, 279 S.E.2d 788, 808 (1981).

In particular, this Court has previously held that submission of both the (e)(4) and (e)(8) aggravating circumstances in a single case is not error because they address different aspects of the crime:

Of the two aggravating circumstances challenged . . . as purportedly being based upon the same evidence, one of the aggravating circumstances looks to the underlying factual basis of defendant's crime, the other to defendant's subjective motivation for his act. The aggravating circumstance that the murder was committed against an officer engaged in the performance of his lawful duties involved the consideration of the factual circumstances of defendant's crime. The aggravating circumstance that the murder was for the purpose of avoiding or preventing a lawful arrest forced the jury to weigh in the balance defendant's motivation in pursuing his course of conduct.

*Id.* at 355, 279 S.E.2d at 809; *see also Golphin*, 352 N.C. at 482, 533 S.E.2d at 244 (holding that submission of both the (e)(4) and (e)(8) circumstances was proper "where the two circumstances were directed at distinct aspects of the crimes charged"). In the instant case, as noted above in our discussion of the (e)(4) aggravator, evidence was presented that one of defendant's motivations in shooting

Chief Hathaway was to avoid arrest for the previous assault on his wife. Submission of the (e)(4) aggravator was therefore proper to address defendant's "subjective motivation" for the killing. *Hutchins*, 303 N.C. at 355, 279 S.E.2d at 809. Also, as noted above in our discussion of the (e)(8) aggravating circumstance, evidence was presented to show that Chief Hathaway was performing an official duty when he responded to Mrs. Nicholson's call. The trial court thus properly submitted the (e)(8) aggravator to address the "factual basis of defendant's crime." *Id.* In sum, although the same series of events provided the basis for submission of both the (e)(4) and (e)(8) aggravating circumstances, the circumstances focused on different aspects of the crime and were supported by different pieces of evidence. Accordingly, the trial court did not err in submitting both the (e)(4) and (e)(8) aggravating circumstances to the jury. *See id.* at 354, 279 S.E.2d at 808. This argument is without merit.

**[17]** Next, defendant argues the trial court erred by allowing the jury to consider the (e)(11) aggravating circumstance because the words of the statute are vague and overbroad under the state and federal constitutions and because there was insufficient evidence to support its submission. The (e)(11) aggravating circumstance reads as follows: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). In the present case, the trial court submitted this circumstance to the jury for its separate consideration in connection with each of the two murders.

This Court has repeatedly held that the (e)(11) aggravating circumstance is constitutional and is not vague or overbroad. *See, e.g., State v. Stephens*, 347 N.C. 352, 368, 493 S.E.2d 435, 445 (1997), *cert. denied*, 525 U.S. 831, 142 L. Ed. 2d 66 (1998); *State v. Cole*, 343 N.C. 399, 421, 471 S.E.2d 362, 372-73 (1996), *cert. denied*, 519 U.S. 1064, 136 L. Ed. 2d 624 (1997); *State v. Williams*, 305 N.C. 656, 684-85, 292 S.E.2d 243, 260-61, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). Moreover, the circumstance was constitutional as applied in the present case. "Evidence that a defendant killed more than one victim is sufficient to support the submission of the course of conduct aggravating circumstance." *Conaway*, 339 N.C. at 530, 453 S.E.2d at 851; *see also State v. Skipper*, 337 N.C. 1, 54, 446 S.E.2d 252, 281-82 (1994) (shooting of two victims within moments of each other was sufficient to establish course of conduct for purposes of the

(e)(11) aggravating circumstance), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). Considered in a light most favorable to the state, *see Syriani*, 333 N.C. at 392, 428 S.E.2d at 141, the evidence in the instant case was clearly sufficient to justify the submission of the course of conduct aggravating circumstance to the jury: the evidence patently supported a finding that the two killings were committed within moments of each other, within feet of each other, and with the same weapon.

Nonetheless, defendant argues that the trial court's instructions did not provide the jurors with adequate guidance, which left the jury to apply the (e)(11) circumstance to the evidence with unfettered discretion. Defendant did not object to the instructions on this basis at trial or request a limiting instruction. In light of the evidence independently supporting the (e)(11) circumstance in each case, we cannot conclude a different result would have been probable even if the trial court had explicitly specified the evidence the jurors were to consider. *See, e.g., Golphin*, 352 N.C. at 483, 533 S.E.2d at 244. Accordingly, there is no plain error, and defendant's argument is without merit.

**[18]** Defendant next contends that the trial court erred in its instructions to the jury regarding the (f)(1) statutory mitigating circumstance—"[t]he defendant has no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1). The trial court's instructions in the case involving Mrs. Nicholson included the following: "Consider whether the defendant has no significant history of prior criminal activity before the date of the murder." Defendant contends that it was error of constitutional magnitude for the trial court to add the phrase "before the date of the murder." By doing so, defendant argues, the trial court improperly submitted a nonstatutory mitigating circumstance in place of the statutory one, thereby allowing the jury to refuse to give this circumstance any weight. Defendant did not object to this alleged error at trial. Our review is therefore limited to plain error. *See Braxton*, 352 N.C. at 222, 531 S.E.2d at 465.

We conclude that the trial court's instruction was proper. It is well settled that the (f)(1) circumstance applies only to criminal activity occurring before the murder for which a defendant is being tried. *See State v. Gell*, 351 N.C. 192, 212, 524 S.E.2d 332, 345, *cert. denied*, 531 U.S. 867, 148 L. Ed. 2d 110 (2000); *State v. Coffey*, 336 N.C. 412, 418, 444 S.E.2d 431, 434 (1994). The additional language used by the trial court in the present case was thus a correct

statement of the law. The trial court further instructed the jury that it should find this circumstance if it determined the circumstance to exist by a preponderance of the evidence. Accordingly, it is evident that the jurors were not permitted to refuse to give this circumstance mitigating value if they found it to exist. The trial court did not convert the statutory mitigating circumstance into a nonstatutory one simply by adding clarifying language. This argument is without merit.

[19] Defendant next argues that the trial court erroneously failed to submit the statutory mitigating circumstance that he acted under duress or the domination of another person. *See* N.C.G.S. § 15A-2000(f)(5). Defendant contends this circumstance was supported by evidence that he acted under duress and under the domination of his wife, Mrs. Nicholson.

It is well established that

> where evidence is presented at a capital sentencing proceeding that may support a statutory mitigating circumstance, the trial court has no discretion as to whether to submit the circumstance. The trial court must submit the circumstance if it is supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. In sum, the test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a juror could reasonably find that the circumstance exists based on the evidence.

*Fletcher*, 348 N.C. at 323, 500 S.E.2d at 686 (citations omitted); *see also State v. Holden*, 346 N.C. 404, 438, 488 S.E.2d 514, 532-33 (1997) (holding that burden of proof to establish existence of mitigating circumstances is on defendant and must be shown by preponderance of the evidence), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998).

In the present case, defendant contends that the following evidence was sufficient to require submission of the (f)(5) mitigating circumstance: that he suffered from borderline functioning and had a borderline IQ; that his judgment and insight were poor and affected by mental retardation and mental and physical illness; that his wife induced him to come to the trailer so he could be apprehended; and that, according to a forensic psychiatrist, he was under the domination of his wife and his perceptions of events were distorted so that

he misinterpreted what was happening around him. Defendant essentially contends that his wife was responsible for creating a situation with which he could not cope by requesting that he come to the trailer to get his clothes, by assuring him that there would be no one else there, and by calling police to come arrest him. Defendant argues that this constitutes substantial evidence and that the jury should have been allowed to consider whether he acted under duress or under the domination of his wife. We disagree.

The above-listed evidence is insufficient to support the submission of the (f)(5) mitigating circumstance. Although the evidence viewed in the light most favorable to defendant tends to show that Mrs. Nicholson induced defendant to come to the trailer so that he could be arrested and that defendant may have been susceptible to pressure from her generally, there is no evidence showing that Mrs. Nicholson's actions pressured defendant into using deadly force against her or Chief Hathaway through duress or dominance. Therefore, " 'a jury finding of this circumstance would have been based solely upon speculation and conjecture, not upon substantial evidence, and the submission of the instruction would be unreasonable as a matter of law.' " *State v. Anderson*, 350 N.C. 152, 183, 513 S.E.2d 296, 315 (quoting *State v. Daniels*, 337 N.C. 243, 273, 446 S.E.2d 298, 316-17 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995)), *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999). Accordingly, the trial court properly refused to submit the (f)(5) mitigating circumstance. This argument fails.

[20] Defendant next maintains the trial court should have submitted, as a nonstatutory mitigating circumstance, the alleged limitations of his intellectual functioning. Defendant contends that the trial court's denial of his request for this mitigating circumstance violated his Eighth Amendment rights under the United States Constitution and violated Article I, Sections 19, 23, and 27 of the North Carolina Constitution.[4]

The sentencer in a capital case must be allowed to consider any factor with mitigating value that fairly arises from the evidence. *Skipper v. South Carolina*, 476 U.S. 1, 4, 90 L. Ed. 2d 1, 6 (1986). Upon the defendant's timely written request, the trial court should submit nonstatutory mitigating circumstances that are supported by

---

4. In this argument, defendant also appears to challenge the trial court's jury charge regarding mitigating circumstances. As we dispose of that argument elsewhere in this opinion, we do not address it here.

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

the evidence. *State v. Brewington*, 352 N.C. 489, 520, 532 S.E.2d 496, 514 (2000), *cert. denied*, 531 U.S. 1165, 148 L. Ed. 2d 992 (2001). When the circumstance requested is subsumed in other statutory or non-statutory mitigating circumstances already submitted, however, the trial court may deny the defendant's request. *Id.* at 521, 532 S.E.2d at 515.

Dr. Wolfe, an expert witness for defendant, testified that defendant's intellectual functioning was "below average." Contending that the evidence supported it, defendant submitted a timely written request for a mitigating circumstance reading: "At the time of the offense, the defendant had some limitations in intellectual functioning." The trial court denied defendant's request after the state objected to it as duplicative.[5] Defendant argues that if, as the trial court told the jury, he has the right to have the jury consider any aspect of his character or record and any of the circumstances of the offense as a basis for a sentence less than death, the trial court should have allowed submission of the requested nonstatutory mitigating circumstance.

The record reveals that the trial court submitted the following nonstatutory mitigating circumstances relating to defendant's limitations in intellectual functioning:

5. The defendant has problems reading and writing.

. . . .

6. The defendant has had a relative lack of education.

. . . .

8. The defendant suffers from borderline intelligence functioning, having a borderline IQ of 66 to 72.

. . . .

9. The defendant is mildly mentally retarded.

. . . .

---

5. The transcript shows that the requested instruction was referred to as "duplicitous." *Webster's* defines "duplicity" as "contradictory doubleness of thought, speech, or action; . . . the belying of one's true intentions by deceptive words or action." *Merriam Webster's Collegiate Dictionary* 359 (10th ed. 1993). Assuming no mistranscription, we assume that the trial judge meant to characterize the instruction as "duplicative," the adjectival form of "duplicate," which is defined as repeating something "over or again often needlessly." *Id.* at 359.

10. The general emotional, physical, and mental condition of the defendant is a mitigating factor[.]

. . . .

15. The defendant's judgment and insight are poor, and his judgment and insight are affected by his mental retardation and mental and physical illness.

. . . .

32. At the time of the offense, the defendant's limited intellectual functioning compromised or decreased his [sic] options available to him to resolve the problem or respond appropriately.

. . . .

39. Any other circumstances arising from the evidence which one or more of you deems to have mitigating value.

The jury found circumstance numbers eight, ten, fifteen, and thirty-two to exist and to have mitigating value. The circumstances submitted allowed the jury to consider and give weight to defendant's limitation in intellectual functioning. As the mitigating circumstance requested by defendant was subsumed in the circumstances already submitted to the jury, *see Brewington*, 352 N.C. at 521, 532 S.E.2d at 515, the trial court properly denied defendant's request. Accordingly, this argument is without merit.

[21] Defendant next argues that the trial court erred in failing to give a peremptory instruction on four statutory mitigating circumstances in both the case involving Mrs. Nicholson and the case involving Chief Hathaway. Defendant claims that there was uncontroverted evidence for each of the following four mitigators submitted: (1) no significant prior criminal history, N.C.G.S. § 15A-2000(f)(1); (2) capital felony committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (3) impaired capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, N.C.G.S. § 15A-2000(f)(6); and (4) age of the defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7).

The trial court should give a peremptory instruction for any statutory mitigating circumstance supported by uncontroverted evidence. *State v. Wallace*, 351 N.C. 481, 525-26, 528 S.E.2d 326, 354, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). Even if a peremptory

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

instruction is given, the weight given to the mitigating circumstance is entirely up to the jury to decide. *State v. Kirkley*, 308 N.C. 196, 220, 302 S.E.2d 144, 158 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988).

After a thorough review of the record, we hold that a peremptory instruction was not warranted for any of these four mitigating circumstances. Where the (f)(1) mitigator is submitted, a jury may take into account any prior criminal activity, not just criminal convictions, of the defendant. *State v. Noland*, 312 N.C. 1, 20-21, 320 S.E.2d 642, 654 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). The state presented evidence that defendant had an earlier conviction for assault on a female. The state also presented evidence tending to show that defendant choked his wife, hit her in the mouth, and threatened to kill her on various occasions. In light of these controverted facts, the trial court did not err in declining to give a peremptory instruction on the (f)(1) mitigating circumstance.

Defendant produced evidence of mental disturbance and impaired capacity to support the submission of the (f)(2) and (f)(6) mitigators, respectively. The record also contains evidence contradicting these mitigators, however. Dr. Wolfe, a forensic psychiatrist, testified that while she found defendant had borderline intellectual functioning, she did not believe he suffered from a psychotic disorder. Cross-examination of Dr. Warren revealed weaknesses in his diagnosis of defendant as having psychological problems. Dr. Warren admitted that most of the medical history he relied on for his diagnosis contained various inconsistencies, such as the fact that the day after defendant was reported to be "acting like a vegetable," he filled out a form to get his gun out of the pawnshop. Moreover, Dr. Warren testified that the information in the mental health report on defendant came primarily from defendant's wife. After a thorough review of the evidence, we hold that the trial court did not err in failing to give a peremptory instruction on the (f)(2) and (f)(6) mitigators.

When considering the (f)(7) mitigating circumstance—defendant's age—the jury may take into account not only the chronological age of the defendant, but also his experience, his criminal tendencies, and the rehabilitative aspects of his character. *See, e.g., State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986) (balancing the defendant's chronological age against his emotional age, physical and mental development, and level of experience). When expert testimony constitutes substantial evidence that the defendant's mental age was mitigating at the time of the crime, the trial court must sub-

mit the (f)(7) mitigator. *State v. Zuniga*, 348 N.C. 214, 217, 498 S.E.2d 611, 613 (1998). Unless the defendant's age has mitigating value as a matter of law, a juror need consider the defendant's age only if that juror finds by a preponderance of the evidence that it has mitigating value. *Rouse*, 339 N.C. at 105, 451 S.E.2d at 569.

Defendant was thirty-two years of age at the time of the killings. The expert testimony of Dr. Warren established defendant's mental age at between twelve and one-half and thirteen years of age. Other testimony indicated that defendant was "clearly . . . on the verge between mild mental retardation and borderline IQ." There was also testimony that while defendant had low intellectual functioning, his social skills were described as "pretty good" and as "his biggest strength." While defendant made the threshold showing required for submission of the (f)(7) mitigator, his mental age was by no means established by a consensus of experts. *See id.* (holding that where the evidence establishing mitigating value was contradictory on the mitigating value of defendant's age, "the jurors were properly instructed that it was within their province to determine whether defendant's age had mitigating value"). In light of the contradictory evidence presented, the trial court did not err in refusing defendant's request for a peremptory instruction on the (f)(7) mitigator.

[22] Defendant next argues that the trial court erred by failing to give a peremptory instruction for each nonstatutory mitigating circumstance that was supported by uncontroverted evidence in each case. The trial court submitted to the jury thirty-four nonstatutory mitigating circumstances. The jury found that twelve of them existed and had mitigating value. The state did not challenge any of the mitigating circumstances submitted.

A defendant is entitled to a peremptory instruction on a nonstatutory mitigating circumstance if the evidence supporting it is uncontroverted and manifestly credible. *State v. McLaughlin*, 341 N.C. 426, 449, 462 S.E.2d 1, 13 (1995), *cert. denied*, 516 U.S. 1133, 133 L. Ed. 2d 879 (1996). Peremptory instructions are not required, however, when the evidence supporting the circumstance is controverted. *Golphin*, 352 N.C. at 475, 533 S.E.2d at 240. A general request for a peremptory instruction on all of the mitigating circumstances is not sufficient. *Skipper*, 337 N.C. at 41-42, 446 S.E.2d at 274-75. Rather, the defendant must make a specific request for each mitigating circumstance for which he or she desires a peremptory instruction. *Id.* The trial court does not err in refusing to give peremptory instructions when counsel fails to submit the requested instructions in writing.

*White,* 349 N.C. at 570, 508 S.E.2d at 275. The trial court should not be required to decide on its own what instructions the defendant may desire. *State v. Green,* 336 N.C. 142, 172-74, 443 S.E.2d 14, 32-33, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant asked the trial court to instruct the jury that non-statutory mitigating circumstances, if found, should be given mitigating value: "[W]e're asking that you give something similar to [pattern jury instruction] 150.11." Defendant also made a blanket request for a peremptory instruction on the nonstatutory mitigating circumstances as follows: "[O]n each of the nonstatutory ones, essentially, we would like for the Court to reflect that we have asked each one of those individually, and for the Court to take a look at each one of those individually instead of collectively."

Defendant did not submit his request for a particular instruction on the nonstatutory mitigating circumstances in writing, but merely asked the court to give "something similar" to pattern jury instruction 150.11. The trial court's refusal to give a peremptory instruction as to the nonstatutory mitigating circumstances was therefore not error. *See White,* 349 N.C. at 570, 508 S.E.2d at 275. Further, when he requested a peremptory instruction for the nonstatutory mitigating circumstances, defendant failed to specifically address each mitigating circumstance. Defendant's exhortation that the trial court construe his blanket request as if he had asked for each mitigating circumstance individually is insufficient. *See Skipper,* 337 N.C. at 41-42, 446 S.E.2d at 274-75. Finally, defendant has made no argument that the evidence supporting the nonstatutory mitigating circumstances was uncontroverted or credible. Accordingly, the trial court committed no error in refusing to give peremptory instructions on the nonstatutory mitigating circumstances. This argument is nonmeritorious.

[23] Defendant next contends that the trial court erred by failing to fully and completely instruct the jury regarding the mitigating circumstances submitted in the case involving Chief Hathaway. Defendant asserts that the trial court substituted a shortened form of the relevant instructions in the case of Chief Hathaway, which had the effect of conveying to the jury an impermissible expression of opinion by the trial court on the importance of the mitigating circumstances it was to consider.

The trial court first instructed the jury regarding mitigating circumstances in the murder of Mrs. Nicholson. In reference to the

jurors' consideration of mitigating evidence, the trial court properly instructed the jurors on the definition of the term "mitigating circumstance," the factors the jury was bound to consider in mitigation, the burden of proof, the lack of a unanimity requirement, and the fact that the jurors must consider each mitigating circumstance listed as well as any others they might deem to have mitigating value. The trial court then read the language of each mitigating circumstance listed on the "Issues and Recommendation as to Punishment" form, and gave an explanation of each circumstance.

The trial court next instructed the jury regarding the murder of Chief Hathaway. The trial court instructed the jury on the same mitigating circumstances it had previously discussed in reference to the case involving Mrs. Nicholson's murder. It fully explained, as it had done before in connection with the murder of Mrs. Nicholson, the nature of mitigating evidence and how the jury could consider it. The trial court then instructed the jury as follows:

> Now, it is your duty to consider the following mitigating circumstances, and any others which you find from the evidence.
>
> Now, I went through the law in great detail as to those mitigating circumstances when I discussed with you the Issues as to [Mrs.] Nicholson.
>
> Since the mitigating factors are the same as to the murder of [Chief] Hathaway, I am not going to go through those circumstances, mitigating circumstances again in detail, because I have already explained the law to you.
>
> However, you have a duty to consider each and every one of those circumstances, and consider the law as I have previously given it to you as to those mitigating circumstances.

The trial court next instructed the jury on the language of each mitigating circumstance it was to consider, but omitted the associated explanation for each circumstance that it had given previously in connection with the murder of Mrs. Nicholson.

Defendant contends that by refusing to repeat the explanation of each mitigating circumstance, the trial court did not give the jury the information it needed to make a decision about each circumstance in the case involving Chief Hathaway. Defendant argues he was entitled to have the jury instructed fully in each case. He further asserts that by omitting the associated explanations, the trial court effectively

gave the impression that the mitigating circumstances in the second case were less important, thereby improperly "commenting" on the evidence. We note that defendant did not object to the omission of the explanations at trial. In fact, when asked by the trial court, defendant affirmatively stated that he "did not see any corrections, deletions or additions" to be made to the instructions. Our analysis is therefore limited to plain error.

This Court has previously held that

N.C.G.S. § 15A-1222 and 15A-1232 prohibit the trial court from expressing an opinion in the presence of the jury on any question of fact to be decided by the jury. " 'In evaluating whether a judge's comments cross into the realm of impermissible opinion, a totality of the circumstances test is utilized.' " *State v. Jones*, 347 N.C. 193, 207, 491 S.E.2d 641, 649 (1997) (quoting *State v. Larrimore*, 340 N.C. 119, 155, 456 S.E.2d 789, 808 (1995)). This Court has also held that

" '[t]he charge of the court must be read as a whole . . . , in the same connected way that the judge is supposed to have intended it and the jury to have considered it . . . .' *State v. Wilson*, 176 N.C. 751, [754-55,] 97 S.E. 496[, 497] (1918). It will be construed contextually, and isolated portions will not be held prejudicial when the charge as [a] whole is correct. If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal."

*State v. Rich*, 351 N.C. 386, 393-94, 527 S.E.2d 299, 303 (2000) (quoting *State v. Lee*, 277 N.C. 205, 214, 176 S.E.2d 765, 770 (1970) (alterations in original) (citations omitted)). Finally, we have stated that the trial court's words " 'may not be detached from the context and the incidents of the trial and then critically examined for an interpretation from which erroneous expressions may be inferred.' " *State v. Chandler*, 342 N.C. 742, 752, 467 S.E.2d 636, 641 (quoting *State v. McWilliams*, 277 N.C. 680, 685, 178 S.E.2d 476, 479 (1971)), *cert. denied*, 519 U.S. 875, 136 L. Ed. 2d 133 (1996).

*State v. Meyer*, 353 N.C. 92, 106, 540 S.E.2d 1, 9 (2000) (citations omitted) (holding that the trial court did not express impermissible opinion when it gave a single instruction on an aggravating circumstance and told the jury to apply that single instruction to its consid-

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

eration of the appropriate punishment for each of two murders), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3235 (2001). The burden rests on the defendant to show he was prejudiced by the trial court's comments. *State v. Davis,* 353 N.C. 1, 41, 539 S.E.2d 243, 269 (2000), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3235 (2001).

The main purposes of the jury charge are "clarification of the issues, elimination of extraneous matters, and declaration and application of the law arising upon the evidence." *State v. Jackson,* 228 N.C. 656, 658, 46 S.E.2d 858, 859 (1948). We presume that jurors "pay close attention to the particular language of the judge's instructions in a criminal case and that they undertake to understand, comprehend, and follow the instructions as given." *State v. Trull,* 349 N.C. 428, 455, 509 S.E.2d 178, 196 (1998) (finding trial court did not express an impermissible opinion by giving a "shorthand" instruction for twenty-four nonstatutory mitigating circumstances and tendering a single peremptory instruction for all of those circumstances), *cert. denied,* 528 U.S. 835, 145 L. Ed. 2d 80 (1999). Further, "jury instructions should be as clear as practicable, without needless repetition." *Id.* at 455-56, 509 S.E.2d at 196.

This Court has held that "[t]he trial judge is not required to repeat a definition each time a word or term is repeated in the charge when it has once been defined." *Robbins,* 275 N.C. at 549-50, 169 S.E.2d at 866. Further, "[j]ust as the mere fact that the judge may spend more time summarizing the *evidence* for the State does not amount to an expression of opinion, no expression of opinion arises merely from the comparative amount of time devoted to giving an *instruction.*" *Porter,* 326 N.C. at 504-05, 391 S.E.2d at 154 (citation omitted) (holding that no impermissible expression of opinion given when trial court spent more time instructing on first-degree murder than on second-degree murder); *see also State v. Matthews,* 299 N.C. 284, 294, 261 S.E.2d 872, 879 (1980) (because the jury had heard all instructions, no error when trial court instructed jury as to one defendant, then stated it would not repeat those instructions but told the jury to apply them to its consideration of the codefendant's case).

Defendant has failed to carry his burden of showing that he was prejudiced by the trial court's decision not to repeat the explanations of each mitigating circumstance. *See Davis,* 353 N.C. at 41, 539 S.E.2d at 269. Our review of the entire jury charge in the present case reveals that the jury was fully and carefully instructed regarding its consideration of mitigating circumstances. The trial court expressly

instructed the jury that it should consider each mitigating circumstance in reference to the death of Chief Hathaway and that it should consider the law as the trial court had previously explained it as to those circumstances. The trial court did not express an impermissible opinion by omitting repetition of the explanation of each mitigating circumstance in its instructions concerning Chief Hathaway's murder, but instead merely avoided unnecessary repetition of information already given. *See Trull*, 349 N.C. at 455-56, 509 S.E.2d at 196. Defendant's argument is nonmeritorious.

[24] Defendant next contends that the trial court's oral instructions did not allow the jury to correctly apply the standard for considering nonstatutory mitigating circumstances to the statutory catchall circumstance. Further, defendant asserts the wording of the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9), printed on the Issues and Recommendation as to Punishment forms used in both cases, erroneously failed to explain the proper standard the jury should apply to determine whether that circumstance existed. Defendant maintains that, because the oral instructions did not match the wording of the Issues and Recommendation as to Punishment forms and did not explain how the jury should apply the oral instructions in conjunction with the forms, the verdict in this case was the product of juror confusion. Defendant contends that the trial court's instructions in this respect amounted to plain error. We address each of these arguments in turn.

The Issues and Recommendation as to Punishment form used in each of defendant's cases contained the following language regarding the (f)(9) catchall mitigating circumstance:

**ISSUE NUMBER TWO:**

Do you find from the evidence the existence of one or more of the following mitigating circumstances?

. . . .

39. Any other circumstances arising from the evidence which one or more of you deems to have mitigating value.

ANSWER: _____

The above passage conveys the statutory catchall language, *see* N.C.G.S. § 15A-2000(f)(9), but omits the phrase "one or more of us finds the mitigating circumstance to exist," which would normally follow the answer blank, *see* N.C.P.I.—Crim. 150.10 (1997).

In the case of Mrs. Nicholson, the trial court's oral instructions included the following:

> [I]n considering Issue Two it would be your duty to consider, as a mitigating circumstance, any aspect of the defendant's character or record, and any of the circumstances of this murder that the defendant contends is a basis for a sentence less than death, and any other circumstances arising from the evidence which you deem to have mitigating value.
>
> . . . .
>
> If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the Issues and Recommendation form.
>
> . . . .
>
> In any event, you would move to consider the other mitigating circumstances and continue in a like manner until you have considered all of the mitigating circumstances listed on the form, and any others which you deem to have mitigating value. It is your duty to consider the following mitigating circumstances, and any others which you find from the evidence.

At this point the trial court instructed the jury on which specific statutory mitigating circumstances it was to consider. It then instructed the jury as follows concerning nonstatutory mitigating circumstances:

> Now, you should also consider the following circumstances arising from the evidence which you find to have mitigating value.
>
> . . . .
>
> If one or more of you find by a preponderance of the evidence that any of the following circumstances exist, and also are deemed by you to have mitigating value, you would so indicate by having your foreperson write "yes" in the space provided.
>
> If none of you find the circumstance to exist, or if none of you deem it to have mitigating value, you would so indicate by having your foreperson write "no" in the space.

The trial court next set out each nonstatutory mitigating circumstance and gave an explanation of each. Finally, it instructed the jury regarding the catchall mitigating circumstance as follows:

"You may consider any other circumstance or circumstances arising from the evidence which you deem to have mitigating value."

If one or more of you so find by a preponderance of the evidence you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the form.

If none of you find any such circumstance to exist, you would indicate by having your foreperson write "no" in that space.

Regarding the murder of Chief Hathaway, the trial court repeated all of the above instructions with the following exception: it did not separately instruct on the catchall circumstance, but instead instructed the jury to consider the catchall along with the nonstatutory mitigating circumstances, or in other words, to consider first whether the circumstances existed and then whether they had mitigating value.

We note defendant concedes that he did not object to either the written Issues and Recommendation as to Punishment forms or to the oral instructions he now alleges were erroneous. Thus, we review for plain error. "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *Holden*, 346 N.C. at 435, 488 S.E.2d at 531.

As to the oral instructions in the case involving the murder of Mrs. Nicholson, we conclude as a preliminary matter that the trial court properly instructed the jury on its consideration of mitigating circumstances. The instructions as to Mrs. Nicholson "properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law." *Davis*, 349 N.C. at 56, 506 S.E.2d at 485.

We first address defendant's argument that the oral instructions did not allow the jury to correctly apply the standard for considering nonstatutory mitigating circumstances to the statutory catchall circumstance. As noted in our discussion of defendant's previous argument, the trial court that fails to repeat its explanation of the mitigating circumstances for each of the charges against the defendant does not commit error. *See Trull*, 349 N.C. at 455-56, 509 S.E.2d at 196. Similarly, the trial court does not necessarily com-

mit error when, as here, it fails to repeat identical instructions regarding the jury's consideration of mitigating circumstances. *See id.* at 455, 509 S.E.2d at 196. Even if we assume *arguendo* that the trial court erred by failing to repeat a separate instruction concerning the catchall mitigating circumstance, it does not rise to the level of plain error.

In considering the catchall circumstance, the jurors must determine first whether the evidence presents any additional mitigating circumstances that are not detailed in either the statutory or nonstatutory mitigating circumstances previously given. If the jurors find any such circumstances, they must then engage in a further determination of whether those circumstances have mitigating value. *See Green,* 336 N.C. at 173, 443 S.E.2d at 32. Accordingly, consideration of mitigating value is an integral second step in the jury's evaluation of whether to find the catchall circumstance. *See Davis,* 349 N.C. at 55, 506 S.E.2d at 485 (the jury must assign value to a mitigating circumstance when it is determining "whether the statutory catchall or the nonstatutory mitigating circumstances exist").

In the case involving Mrs. Nicholson, where defendant admits these instructions were properly given, the jurors did not find the catchall circumstance. The jury, in similar fashion, did not find the catchall circumstance in the case involving Chief Hathaway, which included exactly the same mitigators. In total, the jury found thirteen of the thirty-nine mitigating circumstances presented in the case involving Chief Hathaway.[6] We cannot say that the instructions in the instant case rise to the level of plain error just because the jury did not find the catchall mitigating circumstance. This is the case especially where, as here, defendant has produced no evidence to show that the jury's treatment of the catchall mitigator resulted from juror confusion. We will not disturb the jury's findings based on these factors. We hold that, viewed in their entirety and within the context they were given, the trial court's instructions as to the catchall mitigator presented the law fairly and clearly. *See Rich,* 351 N.C. at 393-94, 527 S.E.2d at 303. Like the trial court's instructions as to the case involving Mrs. Nicholson, these instructions "properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law." *Davis,* 349 N.C. at 56, 506 S.E.2d at 485. Because defendant has not shown that "absent the error, the jury probably would have reached a differ-

6. This count of mitigating circumstances includes the statutory, nonstatutory, and catchall mitigating circumstances submitted.

ent verdict," there was no plain error. *Holden*, 346 N.C. at 435, 488 S.E.2d at 531.

**[25]** Next, we address defendant's contention that the language on the Issues and Recommendation as to Punishment forms failed to explain the proper standard the jury was to apply. Defendant argues that the written forms made no distinction for the jury as to what standard to apply in determining whether the catchall mitigating circumstance existed by omitting the phrase, "one or more of us finds the mitigating circumstance to exist." Defendant failed to object or call to the attention of the trial court the omission of the words he now says should have been included. Assuming *arguendo* that the trial court erred by omitting the final phrase after the answer blank for the catchall mitigating circumstance, the omission does not rise to the level of plain error such that the instructional omission " 'had a probable impact on the jury's finding that . . . defendant was guilty.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)).

As discussed above, the trial court properly instructed the jurors in the case concerning Mrs. Nicholson that they should write in the answer "yes" if one or more of them found the catchall circumstance existed. In the case involving Chief Hathaway, the trial court did not repeat this instruction, but as determined above, if any error was committed, it had no prejudicial impact.[7] The jurors were given general written instructions on both forms, under Issue Two, which directed them to consider whether they found "from the evidence the existence of one or more of the following mitigating circumstances." Each individual juror was to decide under the catchall instruction whether the evidence revealed the existence and mitigating value of any circumstances other than those explicitly listed. The failure of any juror to find such a circumstance based on his or her own personal review of the evidence does not necessarily mean the jurors misunderstood or misapplied the instruction. A defendant must present evidence more compelling than this before we will disturb the product of a jury's deliberations.

Accordingly, given the trial court's oral instructions and the language on the forms, there was no reasonable probability that the

---

7. On this point, we reiterate our holding in *Trull*, that "jury instructions should be as clear as practicable, without needless repetition." 349 N.C. at 455-56, 509 S.E.2d at 196.

omission of the final phrase, "one or more of us finds this circumstance to exist," had any impact on the jurors' failure to find the catchall circumstance or on the verdict. Thus, any error in the written instructions did not rise to the level of plain error. Defendant's arguments concerning the (f)(9) catchall circumstance fail.

[26] Defendant next argues that his constitutional rights were violated when the trial court granted the state's motion to submit North Carolina pattern jury instruction 105.40. He contends that the instruction violated his Sixth Amendment right to develop and present his own theory of the case free from outside interference.

North Carolina pattern jury instruction 105.40, on impeachment of the defendant as a witness by proof of an unrelated crime, reads:

> When evidence has been received that at an earlier time the defendant was convicted of (a) criminal charge(s), you may consider this evidence for one purpose only. If, considering the nature of the crime(s), you believe that this bears on truthfulness, then you may consider it, together with all other facts and circumstances bearing upon the defendant's truthfulness, in deciding whether you will believe or disbelieve his testimony at this trial. It is not evidence of the defendant's guilt in this case. You may not convict him on the present charge because of something he may have done in the past.

N.C.P.I.—Crim. 105.40 (1986). Defendant testified during the guilt-innocence phase of the trial and was impeached by evidence of a previous conviction for assault on a female. The trial court gave the pattern instruction over defendant's objection. Defendant contends that the instruction forced him to explain the prior conviction to the jury, thus compelling him to adjust his defense to the strategy selected for him by the state.

The Sixth Amendment protects the right of the defense to develop and present its own theory of the case without outside interference. *Strickland v. Washington,* 466 U.S. 668, 689, 80 L. Ed. 2d 674, 692 (1984). State interference with the assistance of counsel is presumed to result in prejudice. *Id.* at 692, 80 L. Ed. 2d at 696. As to the issue of jury instructions, we note that choice of instructions is a matter within the trial court's discretion and will not be overturned absent a showing of abuse of discretion. *See Steen,* 352 N.C. at 249, 536 S.E.2d at 14.

The record contains no evidence that this instruction interfered with defendant's right to develop and present his own theory of the case. The prosecution was free to argue defendant's conviction to the jury for purposes of impeaching his testimony because it had properly elicited evidence of the conviction on previous cross-examination. The prior conviction was thus already subject to the jury's consideration. The trial court properly exercised its discretion in instructing the jury as to the limited purpose for which the prior conviction could be used. *See id.* This argument therefore fails.

[27] In his next argument, defendant contends that the trial court committed error when it denied his request to substitute language in North Carolina pattern jury instruction 206.10 on self-defense. Defendant contends that the trial court was obligated to give his instruction because he asked for it in a timely fashion and in proper form and because it was supported by the evidence.

The trial court must give a requested instruction that is supported by both the law and the facts. *State v. Conner,* 345 N.C. 319, 328, 480 S.E.2d 626, 629, *cert. denied,* 522 U.S. 876, 139 L. Ed. 2d 134 (1997). The trial court commits no error by giving the instruction in substance even if it does not use the exact language requested. *State v. Avery,* 315 N.C. 1, 33, 337 S.E.2d 786, 804 (1985). As to a self-defense instruction in particular, this Court noted in *State v. Watson,* 338 N.C. 168, 449 S.E.2d 694 (1994), *cert. denied,* 514 U.S. 1071, 131 L. Ed. 2d 569 (1995), that "juries can better assess the propriety of the degree of deadly force used by defendant" when instructed in terms of the need to use deadly force rather than the need to kill. *Id.* at 182, 449 S.E.2d at 703. An instruction on the need to use deadly force is appropriate where supported by the evidence. *Id.* The Court in *Watson* went on to say that if the evidence shows that

> [the] defendant intended to use deadly force, to disable the victim but not to kill him, it would be appropriate to instruct in terms of the need to use deadly force, rather than the need to kill . . . .
>
> Where the evidence shows . . . an intent to kill rather than an intent to use deadly force, the trial court should instruct the jury . . . in terms of the need to kill.

*Id.* at 183, 449 S.E.2d at 703.

Defendant requested that the language contained in footnote number four of North Carolina pattern jury instruction 206.10 on self-

defense be given. This footnote advises the court to "[s]ubstitute 'to use deadly force against the victim' for 'to kill the victim' when the evidence tends to show that the defendant intended to use deadly force to disable the victim, but not to kill the victim." N.C.P.I.—Crim. 206.10 n.4 (1998) (citing Watson, 338 N.C. at 182-83, 449 S.E.2d at 703). Defendant maintains that the evidence in the present case supported the "deadly force" language rather than the "to kill" language because his only intent during the shootings was to escape from a volatile situation.

Defendant testified that he did not shoot at either victim, but instead fired two shots into the floor of the trailer as he fled. His testimony indicated that he was scared, but defendant did not say that he fired the gun because of his fear. As detailed in a prior section of this opinion, defendant's evidence did not support a self-defense instruction at all, let alone a self-defense instruction with the "deadly force" language. See Reid, 335 N.C. at 671, 440 S.E.2d at 789. In contrast, the state's evidence tended to show that defendant, acting with premeditation and deliberation, shot with the intent to kill the victims. Defendant presented no evidence to show that his use of deadly force was intended only to disable, and not to kill, Chief Hathaway and Mrs. Nicholson. Therefore, even if the evidence had supported a self-defense instruction, an instruction on the need to use "deadly force" rather than "to kill" was not warranted. The trial court therefore did not err in failing to instruct the jury with the exact language defendant requested. See Avery, 315 N.C. at 33, 337 S.E.2d at 804. This argument fails.

## PRESERVATION ISSUES

Defendant raises ten additional issues that have previously been decided by this Court contrary to his position: (1) whether the use of the word "extenuating" creates an inherent conflict in the pattern jury instruction definition of mitigating circumstances; (2) whether the trial court erred by allowing the state to exercise peremptory challenges against jurors who expressed reservations about the death penalty; (3) whether the trial court erred by instructing the jury it could consider N.C.G.S. § 15A-2000(e)(4) and (e)(8) aggravating circumstances when they do not adequately limit the jurors' discretion; (4) whether the trial court erred by instructing the jury that defendant had the burden of proving mitigating circumstances by a preponderance of the evidence; (5) whether the North Carolina death penalty statute is unconstitutional both facially and as applied; (6) whether the trial court erred when it instructed the jury that it was to

decide whether any of the nonstatutory mitigating circumstances had mitigating value before it could consider those circumstances; (7) whether the trial court erred in failing to instruct the jurors that, even if they found that the aggravating circumstances outweighed the mitigating circumstances and were sufficiently substantial to call for imposition of the death penalty, they still had to determine if death was the appropriate punishment in this case; (8) whether the trial court erred when instructing the jury on Issues Three and Four that it "may" consider mitigating circumstances that it found to exist in Issue Two; (9) whether the trial court erred by failing to order the state to specify the aggravating circumstances on which it would rely to seek the death penalty; and (10) whether the trial court lacked jurisdiction to try defendant for first-degree murder because the short-form indictment did not allege all of the elements of first-degree murder..

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. Therefore, we reject these arguments.

## PROPORTIONALITY REVIEW

[28] Having concluded that defendant's capital sentencing proceeding was free of prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of two counts of first-degree murder on the basis of malice, premeditation, and deliberation. In the case involving Mrs. Nicholson, the jury found one aggravating circumstance, that the murder was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). In the case involving Chief Hathaway, the jury found three aggravating circumstances: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (2) the murder was committed against a law enforcement officer while engaged in the performance of his official duties, N.C.G.S. § 15A-2000(e)(8); and

(3) the murder was part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

The trial court submitted five statutory mitigating circumstances as to each murder on defendant's behalf. The jury found that one—the murders were committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2)—existed in connection with each murder. Of the thirty-four nonstatutory mitigating circumstances which were identically submitted for consideration regarding each murder, one or more jurors found that twelve existed and had mitigating value: (1) "defendant suffers from borderline intelligence functioning, having a borderline IQ of 66 to 72"; (2) defendant's "general emotional, physical, and mental condition" is a mitigating circumstance; (3) "defendant's judgment and insight are poor, and his judgment and insight are affected by his mental retardation and mental and physical illness"; (4) "defendant did not initiate the trip to their home the day of the incident—his wife did"; (5) "defendant was told by his wife that there was no warrant for his arrest, [that] no one [was] home but his wife, and that she 'had a piece' "; (6) "defendant felt trapped and cornered on the day of the incident"; (7) "defendant felt that he was set up on the day of the incident"; (8) "defendant was under stress at the time of the offense"; (9) "defendant's actions on the day of the incident were completely out of character for him"; (10) "defendant is slow to anger"; (11) "[a]t the time of the offense, the defendant's limited intellectual functioning compromised or decreased [the] options available to him to resolve the problem or respond appropriately"; and (12) "defendant's perceptions were so distorted that he misinterpreted what was going on around him on the day of the offense."

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Defendant, however, contends the death sentences were imposed in an arbitrary and capricious manner, evidenced by the fact that the jury imposed death even though it had found several mitigating circumstances in defendant's favor. We disagree. The fact that the jury finds mitigating circumstances to exist does not mean it must sentence defendant to life imprisonment, or that its failure to do so is arbitrary. *See, e.g., Conner*, 345 N.C. at 330, 480 S.E.2d at 630. We find no indication that the death sen-

tences were imposed under the influence of passion, prejudice, or any other arbitrary consideration. We turn now to our final statutory duty of proportionality review.

In conducting our proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). One purpose·of our proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Atkins*, 349 N.C. at 114, 505 S.E.2d at 129 (quoting *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). We have found the death penalty disproportionate in seven cases. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation. This Court has held that "a finding of premeditation and deliberation indicates "a more calculated and cold-blooded crime." *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Here, the evidence shows that defendant had previously been abusive towards his wife, including threatening to kill her; defendant warned her not to have anyone else, including the police, at the trailer when he arrived; defendant came to the trailer armed with a gun; defendant shot Chief Hathaway in the face upon being told that Chief Hathaway had a warrant for his arrest; and then defendant chased down his wife, shooting her two or three times as she was lying helplessly on the floor. Second, the evidence shows that defendant deliberately murdered a law enforcement officer for the purpose of evading lawful arrest. "[T]he N.C.G.S. § 15A-2000(e)(4) and (e)(8) aggravating circumstances reflect the General Assembly's recognition that 'the collective conscience requires the most severe penalty for those who flout our system of law enforcement.' " *Golphin*, 352 N.C. at 487, 533

STATE v. NICHOLSON

[355 N.C. 1 (2002)]

S.E.2d at 247 (quoting *State v. Brown*, 320 N.C. 179, 230, 358 S.E.2d 1, 33, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)).

The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

*Hill*, 311 N.C. at 488, 319 S.E.2d at 177 (Mitchell, J. (later C.J.), concurring in part and dissenting in part), *quoted with approval in State v. McKoy*, 323 N.C. 1, 46-47, 372 S.E.2d 12, 37 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Third, defendant was convicted of two counts of first-degree murder. This Court has never found a death sentence disproportionate in a case where the jury has found a defendant guilty of murdering more than one victim. *See State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). Fourth, the jury found the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), in connection with each murder. This Court has held that the (e)(11) circumstance, standing alone, is sufficient to support a sentence of death. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Fifth, and finally, defendant murdered his wife in their home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997) (quoting *Brown*, 320 N.C. at 231, 358 S.E.2d at 34) (alterations in original), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998).

We also compare the present case with cases in which this Court has found the death penalty proportionate. *See McCollum*, 334 N.C. at 240, 244, 433 S.E.2d at 162, 164. Although this Court considers all the cases in the pool of similar cases when engaging in proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out the duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998). Here, for the reasons discussed in the preceding

paragraph, we find this case more similar to cases in which we have found a sentence of death proportionate than to those in which we have found a sentence of death disproportionate. *See McCollum*, 334 N.C. at 240, 244, 433 S.E.2d at 162, 164.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. Based upon the characteristics of this defendant and the crimes he committed, we are convinced that the death sentences recommended by the jury and ordered by the trial court in the instant case are not disproportionate.

Accordingly, we conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Therefore, the judgments of the trial court sentencing defendant to death must be left undisturbed.

NO ERROR.